648 P.2d 300

STATE, ex rel. NEW MEXICO PRESS
ASSOCIATION and New Mexico Broad-
casters Association, Petitioners,

v.

Hon. Bruce E. KAUFMAN, District
Judge, Respondent.

No. 14088.

Supreme Court of New Mexico.

June 2, 1982.

Rehearing Denied July 8, 1982.

Hal Simmons, Albuquerque, for petitioners.

Jeff Bingaman, Atty. Gen., Ralph Muxlow, Asst. Atty. Gen., Charles Baldonado, Chief Sp. Prosecutor, Santa Fe, for respondent.

Martha A. Daly, Santa Fe, for amicus curiae New Mexico Criminal Defense Lawyers Assn.

Johnson & Lanphere, Michael A. Gross, Albuquerque, for amicus curiae Journal Pub. Co.

## OPINION

EASLEY, Chief Justice.

Prior to trial in this penitentiary riot-related murder case, Chapman moved to limit media coverage. The State made no objection. Without notice to the media and without their participation in the hearing on the motion, Judge Kaufman ordered limitations on press coverage.

The New Mexico Press Association and the New Mexico Broadcasters Association (Media) intervened by petitioning this Court to prohibit the restraint. We issued a temporary writ as to part of the complaints, ordered briefs and set a hearing date. Prior to the hearing, Chapman was convicted and sentenced.

We address these questions:

1. Whether the Media has standing to intervene, and if so, whether its filing first in this Court is proper.

2. Whether the issues are moot.

3. Whether the trial court could mandate that the names of jurors not be published.

4. Whether the trial court could order that Chapman not be photographed in the "judicial complex".

5. Whether the Media could be required to preserve all news articles, tapes and transcripts for ten days after the verdict was rendered.

Chapman moved to restrict media coverage to insure him a fair trial. He claimed, *inter alia*, that publishing the jurors' names would subject them to intimidation and harrassment, publication of his photographs would influence testimony of witnesses in this trial and another later trial, and the physical evidence of the stories published or aired by the Media should be preserved for ten days so that he might have access to this evidence, if needed. The trial court held a hearing at which the Media was not represented, since no notice was given to them. Without objection by the prosecution, the court issued its order limiting media coverage as indicated. The Media filed first in this Court to prohibit the actions of the trial judge.

This conflict exemplifies the classic collision between two important constitutional rights. This clash between well-guarded legal principles leaves the Court with the duty to perform a delicate balancing act. Freedom of the press, so sacred to the media, must be weighed against the defendant's right to a fair trial.

" '[O]ne of the most conspicuous features of English justice, that all judicial trials are held in open court, to which the public have free access, ... appears to have been the rule in England from time immemorial.' " *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 566–67, 100 S.Ct. 2814, 2822–23, 65 L.Ed.2d 973 (1980) (quoting F. Pollock, The Expansion of the Common Law 31–32 (1904)). This concept came across the Atlantic and became a part of colonial jurisprudence. Our First Continental Congress vouchsafed the right to trial by jury and openness of the proceedings.

"[O]ne great right is that of trial by jury. This provides, that neither life, liberty nor property, can be taken from the possessor, until twelve of his unexceptionable countrymen and peers of his vicinage, who from that neighbourhood may reasonably be supposed to be acquainted with his character, and the characters of

the witnesses, upon a fair trial, and full enquiry, face to face *in open Court, before as many of the people as chuse to attend,* shall pass their sentence upon oath against him...."

*Id.* at 568–69, 100 S.Ct. at 2823–24 (quoting 1 Journals of the Continental Congress, 1774–1789, at 107 (1904)).

It is no coincidence that the First Amendment to the Constitution of the United States contains the provision that "Congress shall make no law ... abridging the freedom ... of the press." This amendment is made applicable to the states through the Fourteenth Amendment. *Near v. Minnesota,* 283 U.S. 697, 707, 51 S.Ct. 625, 627, 75 L.Ed. 1357 (1931). Article II, section 17, of the New Mexico Constitution contains the same mandate against interference with freedom of the press.

The Sixth Amendment to the United States Constitution, however, secures rights equally fundamental to our jurisprudence: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed...." The Sixth Amendment is made applicable to the states by the Fourteenth Amendment. *Duncan v. Louisiana,* 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968). "The authors of the Bill of Rights did not undertake to assign priorities as between First Amendment and Sixth Amendment rights" and the interplay of these sacred Amendments are as old as the Republic itself. *Nebraska Press Assn. v. Stuart,* 427 U.S. 539, 561, 96 S.Ct. 2791, 2803, 49 L.Ed.2d 683 (1976).

We fully agree with Mr. Justice Black's observation that "free speech and fair trials are two of the most cherished policies of our civilization, and it would be a trying task to choose between them." *Bridges v. California,* 314 U.S. 252, 260, 62 S.Ct. 190, 192, 86 L.Ed. 192 (1941). In analyzing the interplay of the First and Sixth Amendments, we note that "[a]ny prior restraint on expression comes to this Court with a 'heavy presumption' against its constitutional validity." *Organization for a Better Austin v. Keefe,* 402 U.S. 415, 419, 91 S.Ct. 1575, 1577, 29 L.Ed.2d 1 (1971) (citations omitted).

In *Nebraska Press Assn., supra,* 427 U.S. at 587, 96 S.Ct. at 2816 (Brennan, J., concurring), Justice Brennan stated:

Commentary and reporting on the criminal justice system is at the core of First Amendment values.... Secrecy of judicial action can only breed ignorance and distrust of courts and suspicion concerning the competence and impartiality of judges; free and robust reporting, criticism, and debate can contribute to public understanding of the rule of law and to comprehension of the functioning of the entire criminal justice system ... by subjecting it to the clensing effects of exposure and public accountability. [Citations omitted.]

The issues in our case must be matched with this impressive authority.

1. *Standing.*

The Media did not plead or appear in the trial court, but filed a petition for a writ in this Court. Thus, issues arise as to whether the Media has standing to intervene in this criminal case, particularly at the appellate level.

Cases from many jurisdictions make it clear that the news media has standing to question the validity of an order impairing its ability to report the news, even though it is not a party to the litigation below. *See, e.g., State ex rel. Miami Herald Pub. v. McIntosh,* 340 So.2d 904 (Fla.1977). However, the news media has no right to intervene as a party in a criminal case. *State v. Bianchi,* 92 Wash.2d 91, 593 P.2d 1330 (1979). The proper approach lies in a separate action for declaratory judgment, mandamus or prohibition. *Bianchi, supra.* Therefore, we find that the Media has standing.

In Canon 3(A)(7), Code of Judicial Conduct, 20 N.M.St.B.Bull. 1249–51 (1981), we provided that an appellate court shall not exercise its appellate or supervisory jurisdiction to review an order banning media coverage. The State argues that we should

deny this petition based on that section. The Court finds that we are compelled by our New Mexico Constitution, Article VI, section 3, to hear cases involving writs of prohibition, and that these issues are of such great importance, the guidelines are now so indefinite and the potential for further disputes so great that we address these questions.

■ Furthermore, when an order banning coverage constitutes a prior restraint, it attenuates the basic constitutional rights of the media to publish. If no effective review is provided, constitutional error may be uncorrected. *See United States v. Dickinson*, 465 F.2d 496 (5th Cir. 1972).

■ We hold that the Media has a right to appear and contest this decision.

It is imminently necessary that the trial courts, the attorneys and the litigants be given more definite guidelines for reconciling these competing positions. In satisfying these guidelines, we draw liberally on *Seattle Times v. Ishikawa*, 97 Wash.2d 30, 640 P.2d 716 (1982).

We hold as follows:

■ The media right to publish is not absolute. *See Richmond Newspapers, Inc., supra.* It may be limited to protect other interests.

■ When restrictions are sought in a criminal case, the trial court should require certain steps. The proponent of the ban must specify the reasons for and show cause for a limitation. If it is sought for the purpose of protecting a defendant's right to a fair trial, the evidence must demonstrate that there is a substantial likelihood that the presence of cameras will deny defendant a fair trial. However, if a limitation is sought to protect other interests, which involve important constitutional rights, a higher test should be required. The proponent of a ban should in that case prove that a "serious and imminent threat to some other important interest" exists.

■ Before placing restrictions on the media, some minimum form of notice should be given to the media and a hearing held. Anyone present should be given an opportunity to object. These proceedings should take place in advance of the date set for trial, if possible, to avoid delays and postponements. Short notice, proof by affidavits, abbreviated hearings are not precluded.

■ The court should weigh the competing interests of the defendant and the public and determine if the limitation sought would be effective in protecting the interests threatened and if it would be the least restrictive means available. The court is charged with the duty of considering all reasonable alternatives to limiting media coverage. *Sacramento Bee v. United States Dist. Court*, 656 F.2d 477 (9th Cir. 1981). Its consideration of these issues should be articulated in oral or written findings and conclusions in the record, but formal findings and conclusions are not necessary. The order must be no broader in application or duration than necessary to serve its purpose.

■ In deciding whether to exclude media coverage of a particular participant, the trial judge should require evidence sufficient to support a finding that such coverage will have a substantial effect upon the particular individual which would be qualitatively different from the effect on members of the public in general and that such effect will be qualitatively different from coverage by other types of media. This test is derived from *Petition of Post-Newsweek Stations, Florida*, 370 So.2d 764 (Fla.1979), and *State v. Palm Beach Newspapers, Inc.*, 395 So.2d 544 (Fla.1981). In *Palm Beach Newspapers*, 395 So.2d at 549, the Florida Supreme Court stated:

We also reiterate, however, that it remains essential for trial judges to err on the side of fair trial rights for both the state and the defense. The electronic media's presence in Florida's courtrooms is desirable, but it is not indispensable.

2. *Mootness.*

■ Chapman argues that his trial is over and the issues raised here are now

moot. It is not a function of this Court to give opinions on merely abstract or theoretical matters, but to settle actual controversies affecting the rights of the parties. A well-defined exception to the mootness rule is present here. Where the issues involved are of substantial public interest and are capable of repetition yet evading appellate review, this Court will decide the questions. See Mowrer v. Rusk, 95 N.M. 48, 618 P.2d 886 (1980). The same important questions of media access will surely be raised again without there being an opportunity for a decision on appeal. The issues, although moot in this case, will be addressed on their merits.

### 3. Restraint on Publication of Jurors' Names.

Judge Kaufman's order prohibited the release or publication of the names of prospective or selected jurors. However, the names of the jurors were read in open court and a jury list was filed in the district court clerk's office.

Chapman claims the restriction against publication of the jurors' names has only a minimal impact on First Amendment rights and is necessary to insure him a fair trial as guaranteed under the Sixth Amendment to the United States Constitution. The State made no objection to Judge Kaufman's order, and the State also expressed concern that there might be efforts to tamper with the jury, as had happened previously in another similar case. The judge considered and ruled out sequestration of the jury. Prior to their selection, the trial court advised the jurors that their names would not be published. Some jurors indicated apprehension about their names being known, and all jurors expressed their approval of preventing the media from publishing their names.

This is one of the many criminal trials arising out of the February 1980 prison riot at the state penitentiary at Santa Fe. Publicity has been high, not only locally but also nationally. The trial court sought to prevent jury tampering and allay any fears the jurors might have of reprisals by issuing a gag order on the Media. His rejections of the motion to sequester the jury was an implicit finding that the gag order was the best method to protect the jury and fulfill the defendant's right to a fair trial. In effect, the trial court partially closed the trial from the Media.

In Richmond Newspapers, Inc., supra, the United States Supreme Court ruled that sequestration of the jury during the trial should have been considered as an alternative to guard against the jurors' being subjected to any improper information. The Court held that "there exists in the context of the trial itself various tested alternatives to satisfy the constitutional demands of fairness." Id. 448 U.S. at 581, 100 S.Ct. at 2830 (citations omitted). The Court said:

> Nor is there anything to indicate that sequestration of the jurors would not have guarded against their being subjected to any improper information. All of the alternatives admittedly present difficulties for trial courts, but none of the factors relied on here was beyond the realm of the manageable. Absent an overriding interest articulated in findings, the trial of a criminal case must be open to the public.

Id. (footnote omitted). This case is somewhat different from ours, in that Judge Kaufman considered sequestration but ruled it out. See In re United States ex rel. Pulitzer Pub. Co., 635 F.2d 676 (8th Cir. 1980).

In Nebraska Press Assn., supra, the Court announced a three prong test to judge restraints on the media. For the purposes of applying that test to the facts of this case, we restate the three prongs as follows: (1) What is the nature and extent of the evil of publication? (2) Are there any alternatives to imposing a gag order? and (3) Were the means selected adequately tailored to accomplish the ends sought?

This test was applied in a case very similar to the one before us. In Des Moines Register & Tribune v. Osmundson, 248 N.W.2d 493 (Iowa 1976), the Iowa Supreme Court considered whether a trial court could prevent the media from publishing the

names, addresses and telephone numbers of jurors when that information was public. The court first determined that there was no evidence in the record to support the view that the jurors feared reprisals during or after trial. Secondly, even if the jurors were afraid, the trial court failed to consider adequately other alternatives which would insulate the jurors from improper influence rather than imposing a gag order. And finally, the court found that the gag order was not adequately tailored to alleviate the jurors' fear of reprisals against them and their families by defendant or defendant's friends. The names, addresses, telephone numbers and physical identity of the jurors were a matter of public record. Consequently, the court held that the prior restraint on the media did not satisfy the *Nebraska Press Assn.* test. *See also* 2 A.B.A. STANDARDS FOR CRIMINAL JUSTICE § 8–3.6(d)(ii) (2d ed. 1980).

▇ Mere speculation that publishing the names of jurors might expose them to intimidation during the trial is not sufficient reason to justify a prior restraint on the Media. Thus, the first prong of the test in *Nebraska Press Assn., supra,* has not been met. Furthermore, since the names of the jurors were announced in open court and filed as a public record, the procedures failed the third prong of the test. Every citizen has a right to inspect public records, with certain well-defined exceptions. § 14–2–1, N.M.S.A.1978 (Cum.Supp.1981). There is no question that the jury list is a public record and that the Media was entitled to inspect and publish it. *See Cox Broadcasting Corp. v. Cohn,* 420 U.S. 469, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975).

▇ Thus, one of the problems with the gag order in this case is that the means selected by the trial judge to prevent intimidation were not carefully tailored to accomplish the ends sought. We hold that a prior restraint on publication of jurors' names must be based upon imperative circumstances supported by a record that clearly demonstrates that a defendant's right to a fair trial will be jeopardized and that there are no other reasonable alterna-

tives to protect that right. *See State ex rel. Beacon Journal Pub. Co. v. Kainrad,* 46 Ohio St.2d 349, 348 N.E.2d 695 (1976). This record is deficient in that regard, and the trial judge was in error to exclude publication of the jurors' names.

### 4. *Photograph of Defendant.*

▇ The trial court's order restricted the media from photographing Chapman in the "judicial complex". Chapman argues that the penitentiary riot and the trials arising out of it have received an enormous amount of publicity and that further public display of his picture would taint the public perception of him and prevent the empanelling of an impartial jury in this case as well as another case set for later trial. He also claimed that publication of his picture would taint any identification testimony.

The Media has always had the right in New Mexico to take photographs of defendants so long as they were not taken in the courtroom. Thus, the order extending the ban to other places in the judicial complex would be a retreat from our prior law. Our new Canon 3(A)(7) extends the rights of the media to take photographs even in the courtroom, unless the court finds good cause to prohibit them.

We said only recently in *Hubbard Broadcasting v. Allen,* No. 14,197 (N.M.S.Ct. March 17, 1982) that the good cause found by the judge must be supported in the record by such evidence as would lead the court to believe that the presence of cameras in the courtroom would result in an unfair trial for the defendant.

The generalized statements of Chapman in this case, that publishing his picture would taint the public's perception of him and prevent his having an impartial jury or would have some indefinite effect on his identification, are neither substantial nor persuasive that he would not receive a fair trial. The trial court was in error in this regard and is reversed.

### 5. *Order to Preserve Tapes and Articles.*

▇ The court ordered that all media representatives covering the trial "preserve articles, tapes or transcripts . . . until ten

days after the verdict is rendered." Chapman advanced the novel notion that he has a right under the fair trial provision of the Sixth Amendment to have these articles preserved by the Media. He cites no authority that supports the theory, and we found none.

The United States Supreme Court has not considered the specific issue but has ruled in two cases that interference in or regulation of the manner in which a publisher conducts his business is not permissible. *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974), dealt with a state statute requiring a newspaper to print a political candidate's reply to press criticism. *Columbia Broadcasting v. Democratic Comm.*, 412 U.S. 94, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973), involved a requirement that a television station air paid political advertisements. The Court refused to allow the imposition of such requirements in both cases.

There was not sufficient evidence to establish that Judge Kaufman's order restraining the Media of its freedom to handle its records was a valid exercise of judicial power under any legal theory. We reverse the trial court on this issue.

IT IS SO ORDERED.

SOSA, Senior Justice, and PAYNE and FEDERICI, JJ., concur.

RIORDAN, J., not participating.