918 P.2d 332

Ray TWOHIG, Attorney for Gordon House, Gordon House, and Carolyn House, Petitioners,

v.

The Hon. James F. BLACKMER, Judge, Division II, District Court of the Second Judicial District, Bernalillo County, State of New Mexico, Respondent,

and

State of New Mexico, Real Party in Interest.

No. 22704.

Supreme Court of New Mexico.

May 20, 1996.

Adam G. Kurtz, Ray Twohig, P.C., Ray Twohig, Albuquerque, for Petitioners.

Tom Udall, Attorney General, Donna L. Dagnall, Assistant Attorney General, Santa Fe, for Respondent.

Robert M. Schwartz, District Attorney, Steven S. Suttle, Assistant Chief Deputy District Attorney, Albuquerque, for Real Party in Interest.

## OPINION

RANSOM, Justice.

1. Attorney Ray Twohig petitioned this Court for a writ of superintending control vacating a trial court order prohibiting all trial participants from communicating with the media about the third trial of Twohig's client, Gordon House. As grounds for his petition, Twohig claimed that this "gag order" impermissibly restricted his rights of free speech in violation of Article II, Section 17 of the New Mexico Constitution and our recently amended rule governing trial publicity, SCRA 1986, 16–306 (Repl.Pamp.1995). We assumed jurisdiction over Twohig's petition under the New Mexico Constitution, Article VI, Section 3 (providing that Supreme Court shall have power of superintending control over all inferior courts). *See* SCRA1986, 12–504 (Cum.Supp.1995) (establishing procedure for issuance of extraordinary writs). At a hearing held before us on March 22, 1995, we issued our writ vacating the order in question. In this opinion we explain the reasons for our earlier ruling and hold, in the absence of certain requisite findings of fact supporting a conclusion that a universal restriction of speech was necessary to meet a clear and present danger of infringing House's and the State's right to a fair trial, the gag order issued here violated Article II, Section 17 and Rule 16–306.

2. *Facts and Proceedings.* The amount of publicity surrounding a fatal 1992 Christmas Eve accident and the three trials of House on vehicular-homicide charges well may be unprecedented in New Mexico.

From the beginning it was made generally known that House had been involved in a wreck that claimed the lives of Melanie Cravens and her three daughters. It was also made known that when the accident occurred, House was driving at nighttime at a high rate of speed in the wrong direction on Interstate 40. *See* Steve Shoup, *Police Suspect Alcohol in Christmas Eve Wreck,* Albuquerque J., Dec. 26, 1992, at A1, A8. It was speculated that House had been drinking, *see id.,* and test results made public by the Albuquerque Police Department (APD) soon after the accident indicated that five hours after the fatal crash House had a blood alcohol level of 0.1 percent, *see* Robert Rodriguez, *Test Says House Legally Drunk,* Albuquerque J., Dec. 30, 1992, at A1.

3. Long before the first trial, prosecution and defense attorneys commented extensively in the media about the case and the issues presented by it. The strategies and opinions of the lawyers received early press coverage. An article appearing in the Albuquerque Journal quoted Twohig as saying " 'experts will be used' to determine whether the signs on the Volcan offramp were confusing or insufficient." Patricia Gabbett Snow, *Officer: Pickup Sped Wrong Way 10 Miles,* Albuquerque J., Jan. 9, 1993, at A1, A3. In this same article, Chief Deputy District Attorney Alan Rackstraw was quoted to the effect that, although he would not release results of a blood sample taken from House by University Hospital staff members on the evening of the crash, "I don't deny that they are consistent with the tests from APD." *Id.*

4. Twohig attacked the blood-test results almost immediately. In an article appearing in the Navajo Times—a paper published in Window Rock, Arizona—Twohig hinted that "some important facts" in House's case had not been made public. Valerie Taliman, *Family Seeks Fair Justice,* Navajo Times, Jan. 14, 1993, at 1. He also stated that the blood-alcohol test taken by APD may not have been accurate because testing equipment at the APD lab was broken within a two-day period prior to testing and there was no proof that the instruments had been fixed. *Id.* at 3.

748

5. Another theme that surfaced early on was Twohig's contention that charges against his client were racially motivated. Prior to House's first trial, Twohig said, "I can tell you this, if Gordon House was not Native American and if the victims were not Anglos, despite tragedy, [this case] would not have received any where near the kind of media attention it has generated." *Id.* at 1. Further, commenting on the fact that a police report still had not been filed nearly three weeks after the accident, Twohig said, "It appears to me that the only reason the police department has not filed a report is that they are attempting to leak information selectively to press people in order to get their story before the public as effectively as possible." *Id.* at 3. He concluded that "[t]he public and press have already convicted Gordon House and they've got the noose ready for him." *Id.*

6. Allegations of racial bias reached their zenith when District Attorney Robert Schwartz announced his intention to pursue first-degree depraved-mind murder charges against House. *See* Leslie Linthicum, *House May Face Murder Charges,* The Sunday J., Mar. 21, 1993, at A1. Explaining why the State had decided to pursue these charges, Schwartz stated that "the case [had] turned up 'information that takes us way beyond vehicular homicide.'" *Id.* He elaborated further, stating, "The big difference is we now have a report with all kinds of information we didn't have then.... It's not simply the raw fact of being in the wrong lane of the freeway and going the wrong way. There's more." *Id.* at A5. Twohig disagreed, accusing the District Attorney of "prosecutorial overreaching." *Id.* at A1. In a separate article reporting the District Attorney's decision to add first-degree murder charges to charges of vehicular homicide and driving while intoxicated, Schwartz stated that "there is evidence that House had the opportunity to avoid the accident." Laura Bendix, *DWI Defense Denounces Murder Charges,* Albuquerque Trib., Mar. 22, 1993, at A1.

7. Following the jury's verdict in House's first trial—guilty of driving while intoxicated, hung jury on charges of reckless driving, vehicular homicide, and causing great bodily harm—there was extensive comment by the attorneys in the case and by relatives of the victims and of the defendant. Bob Milford, Melanie Cravens' father, said: "The system is flawed. A child could have figured it out. If they believed he was drunk and he was on the wrong side of the road, why doesn't the rest fall into place?" Leslie Linthicum, *DWI Only Guilty Count,* Albuquerque J., June 19, 1994, at A1, A14.

8. On November 23, 1994, after a second trial on charges of vehicular homicide had resulted in a hung jury, District Attorney Robert Schwartz announced his intention to try House for a third time. Ed Asher, *House Trial Ends in Hung Jury,* Albuquerque Trib., Nov. 23, 1994, at A1. When he made this announcement, Schwartz, echoing sentiments he had expressed following the first trial, stated that those members of the House jury who had voted to acquit could have done so only out of sympathy for House. Schwartz also stated that House should take responsibility for his actions.

9. In response to Schwartz's comments, Twohig wrote an article that was published in the Albuquerque Journal. Ray Twohig, *Justice Would Not Be Served by Third Trial for Gordon House,* Albuquerque J., Dec. 2, 1994, at A15. In that article Twohig wrote: "by trying to force the case to go to trial a third time, the district attorney continues to ignore his responsibility to seek justice in this case. Instead, he has adopted the lust for vengeance of some who speak for the Cravens, Woodard, and Milford families." *Id.* Twohig also appeared as a guest on several radio talk shows. During these talk shows he responded to questions about issues of evidence and law presented at the first two trials and also responded to questions from citizen callers.

10. Soon after Twohig's newspaper article and radio talk-show appearances, the State filed a motion for an injunction prohibiting all attorneys, parties, and related persons "from making any comment in the media ... regarding any substantive issue dealing with [the House] case." The ostensible purpose of this motion was to preserve the parties' right to a fair trial. Twohig filed a response in which he argued:

The statements of the District Attorney have created a strong sentiment against the Defendant in the public arena.

. . . .

The attorney for the Defendant has a First Amendment right to speak about this case, which is unquestionably a matter of great public interest in New Mexico. Counsel for Defendant insists upon his right to speak in response to the misleading and inaccurate statements of the District Attorney and his assistants concerning this case.

. . . .

The Code of Professional Responsibility only restricts comment which is false or creates a clear and present danger of prejudicing the proceeding. SCRA1986, 16–306 (Cum.Supp.1994).

On December 16, 1994, the Honorable James F. Blackmer conducted a hearing on the State's motion. At this hearing Twohig introduced several newspaper articles and videotaped news broadcasts. Relying upon its inherent authority and citing the strictures in Rule 16–306 of the Rules of Professional Conduct, the court granted the State's motion. The resulting gag order prohibited counsel for both parties "from making any extrajudicial oral or written statement, comment, opinion, press release, letter or other communication to or through any media or public fora, ... on any substantive matters or substantive issues of this case." The order also directed counsel to refrain from releasing motions and pleadings to the press without the court's prior approval.

■ 11. *Rule 16–306 requires facts demonstrating a clear and present danger to the judicial process.* SCRA1986, 16–306 (Repl. Pamp.1995) provides that "[a] lawyer shall not make any extrajudicial ... statement in a criminal proceeding that may be tried to a jury that the lawyer knows or reasonably should know ... creates a clear and present danger of prejudicing the proceeding." The clear and present danger standard adopted in this rule is based upon the premise that "the well-being of the judicial, administrative and legislative systems, and of the larger society of which they are parts, requires a public informed of matters arising in law

practice and of matters pertaining to proceedings of public interest." SCRA 16–306 cmt. As observed by the U.S. Supreme Court, "The principle that justice cannot survive behind walls of silence has long been reflected in the 'Anglo–American distrust for secret trials.'" *Sheppard v. Maxwell,* 384 U.S. 333, 349, 86 S.Ct. 1507, 1515, 16 L.Ed.2d 600 (1966) (quoting *In re Oliver,* 333 U.S. 257, 268, 68 S.Ct. 499, 505, 92 L.Ed. 682 (1948)). As we explain below, to ensure that an appropriate balance is struck between rights of free speech and the interest in fair and impartial adjudication, any prior restraint on public comment by trial participants must be accompanied by specific factual findings supporting the conclusion that further extrajudicial statements would pose a clear and present danger to the administration of justice.

■ 12. *Constitutional underpinnings of Rule 16–306.* Article II, Section 17 of the New Mexico Constitution provides:

Every person may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right; and no law shall be passed to restrain or abridge the liberty of speech or of the press.

By its terms, Article II, Section 17 protects the right of each person to disseminate his or her ideas on any number of subjects and prohibits legislation that restricts the right of free speech. Although Article II, Section 17 expressly prohibits only the legislature from abridging freedom of speech, "there is no reason why the courts [should] be given greater power" in this regard. *Blount v. TD Publishing Corp.,* 77 N.M. 384, 388, 423 P.2d 421, 424 (1966). Therefore, the gag order issued by the trial court is subject to constitutional scrutiny.

■ 13. An order such as the one issued here, which prohibits trial participants from speaking with anyone about the case, is a prior restraint. *See, e.g., Breiner v. Takao,* 73 Haw. 499, 835 P.2d 637, 640–41 (1992) (analyzing as a prior restraint order which prohibited parties from talking with media about pending murder trial); *Kemner v. Monsanto Co.,* 112 Ill.2d 223, 97 Ill.Dec. 454,

463, 492 N.E.2d 1327, 1336 (1986) (analyzing as a prior restraint order that prohibited all communication between a party and the media about civil trial involving claims against chemical manufacturer); *Davenport v. Garcia*, 834 S.W.2d 4, 9–11 (Tex.1992) (analyzing as a prior restraint order that prohibited trial participants from discussing pending civil suit outside of courtroom). A prior restraint requires special judicial attention. Thus we have observed that "[a]ny prior restraint on expression comes to this Court with a 'heavy presumption' against its constitutional validity." *State ex rel. New Mexico Press Ass'n v. Kaufman*, 98 N.M. 261, 264, 648 P.2d 300, 303 (1982) (alteration in original) (quoting *Organization for a Better Austin v. Keefe*, 402 U.S. 415, 419, 91 S.Ct. 1575, 1578, 29 L.Ed.2d 1 (1971)).

■ 14. Nevertheless, a prior restraint is not unconstitutional per se. *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 558, 95 S.Ct. 1239, 1246, 43 L.Ed.2d 448 (1975). Courts agree that, "[i]n order to achieve the delicate balance between the desirability of free discussion and the necessity for fair adjudication, ... a trial court can restrain parties and their attorneys from making extrajudicial comments." *Kemner*, 97 Ill.Dec. at 463–64, 492 N.E.2d at 1336–37. New Mexico's Rule 16–306 and similar provisions in effect in other states—"substantial likelihood" or "serious and imminent threat" of prejudicing a fair and impartial trial—are an articulation of the abstract considerations that go into striking this delicate balance. Various precedents of the United States Supreme Court and of the courts of other states have outlined the constitutional limitations on a court's power to impose speech restrictions on attorneys and other trial participants under particular factual circumstances. The thrust of prior-restraint cases in general, and of cases involving limitations on the speech of trial participants in particular, is that post-speech remedies are favored over prior restraints. *See, e.g., Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559, 96 S.Ct. 2791, 2802–03, 49 L.Ed.2d 683 (1976) (distinguishing criminal punishments for speech from prior restraints in case involving restrictive order entered against press); *Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 713–

15, 51 S.Ct. 625, 630–31, 75 L.Ed. 1357 (1931) (noting that punishment for libel or slander is permissible and preferable to system of prior restraint).

15. The U.S. Supreme Court decision in *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 111 S.Ct. 2720, 115 L.Ed.2d 888 (1991), underlies the analysis in most attorney political speech cases decided in recent years. Writing for the Court, Chief Justice Rehnquist noted that "[m]embership in the bar is a privilege burdened with conditions." *Id.* at 1066, 111 S.Ct. at 2740 (quoting *In re Rouss*, 221 N.Y. 81, 116 N.E. 782, 783 (1917), *cert. denied*, 246 U.S. 661, 38 S.Ct. 332, 62 L.Ed. 927 (1918)). Reasoning that "[t]he outcome of a criminal trial is to be decided by impartial jurors ... based on material admitted into evidence before them in a court proceeding," *id.* 501 U.S. at 1070, 111 S.Ct. at 2742, and that, "[a]s officers of the court, court personnel and attorneys have a fiduciary responsibility not to engage in public debate that will redound to the detriment of the accused or that will obstruct the fair administration of justice," *id.* at 1074, 111 S.Ct. at 2744 (alteration in original) (quoting *Nebraska Press Ass'n*, 427 U.S. at 601 n. 27, 96 S.Ct. at 2824 n. 27 (Brennan, J., specially concurring)), the Court held that the "substantial likelihood" standard adopted by Nevada was sufficient to safeguard constitutionally protected speech, *id.* 501 U.S. at 1075, 111 S.Ct. at 2745. The Court nevertheless held that the Nevada disciplinary rule was void for vagueness because under Section 177(3) of the Nevada disciplinary rule an attorney could "state without elaboration ... the general nature of the ... defense" notwithstanding express prohibitions contained in subsections (1) and (2) of Section 177. *Id.* at 1048, 111 S.Ct. at 2731. Thus, because Section 177(3) failed to provide adequate guidance as to what statements were permissible and what statements were not, sanctions were improper against an attorney who had asserted that the state had sought indictment of an innocent man and had not "been honest enough to indict the people who did it; the police department, crooked cops." *Id.* at 1034, 111 S.Ct. at 2724.

16. After *Gentile* was decided, this Court amended the New Mexico disciplinary rule governing pretrial publicity. Our rule adopted the "clear and present danger" standard, which differs semantically from the "substantial likelihood of material prejudice" standard that the U.S. Supreme Court found constitutionally adequate as a general formulation of the test for permissible restrictions on attorney speech. *Gentile* and the precedents upon which it relies make clear, however, that whatever particular articulation of the test is adopted, the essential inquiry remains unchanged: "a court [must] make its own inquiry into the imminence and magnitude of the danger said to flow from [a] particular utterance and then ... balance the character of the evil, as well as its likelihood, against the need for free and unfettered expression." *Gentile*, 501 U.S. at 1036, 111 S.Ct. at 2725 (plurality opinion) (quoting *Landmark Communications, Inc. v. Virginia*, 435 U.S. 829, 843, 98 S.Ct. 1535, 1543–44, 56 L.Ed.2d 1 (1978)). Further, the inquiry is the same regardless of whether a court is analyzing the constitutionality of a gag order, *see Nebraska Press Ass'n*, 427 U.S. at 562–69, (striking down order prohibiting press from publishing confessions and admissions of defendant as well as other facts "strongly implicative" of defendant), considering the propriety of disciplinary action, *see Gentile*, 501 U.S. at 1048–51, 111 S.Ct. at 2731–33 (proposed sanctions), or determining whether pretrial publicity was so pervasive as to deprive a criminal defendant of a fair trial, *see Sheppard*, 384 U.S. at 363, 86 S.Ct. at 1522–23 (remanding for new trial). Thus when analyzing whether the gag order issued here was appropriate, we legitimately may resort to each of these three types of cases.

17. *Cases considering gag orders.* Our research has uncovered about an equal number of cases upholding and striking down gag orders. A close examination of the factual circumstances underlying the courts' conclusions in these cases should aid members of the bar in determining the type of statements that will support a gag order and those that will not. From these cases emerge five considerations that the trial court specifically must address prior to the issuance of any gag order: what may not be said, when it may not be said, where it may not be said, who may not say it, and whether alternatives less restrictive of free speech than an outright ban would suffice to alleviate any prejudice caused by further speech.

18. *Cases upholding gag orders.* In *Levine v. United States District Court*, 764 F.2d 590, 600–01 (9th Cir.1985), *cert. denied*, 476 U.S. 1158, 106 S.Ct. 2276, 90 L.Ed.2d 719 (1986), the Ninth Circuit concluded that there were sufficient facts to justify entry of a gag order to safeguard the defendant's right to a fair trial, although it struck down as overbroad the particular gag order in that case. *Levine* involved a highly publicized espionage trial in which the defendant, a former special agent with the Federal Bureau of Investigations, was charged with passing classified documents to two Russian emigres. *Id.* at 591. While the trial of the Russians was proceeding and before trial of the FBI agent had begun, an attorney for the former, commenting on the government's decision to drop four counts of aiding and abetting espionage, stated: "The dismissal of these charges means the government has now conceded that no documents were ever passed. It's also a concession that there's been no damage to national security." *Id.* at 592 (quoting William Overend, *Lawyers Contend FBI Exaggerated Evidence in Spy Case*, L.A. Times, Mar. 3, 1985, pt. 1., at 3). Attorneys for the FBI agent were characterized as agreeing with this assessment, stating, "To a large extent, the FBI misled the U.S. attorney's office about the strength of the case until it was too late." *Id.* The attorneys also added comments of their own.

> The only reason [our client] is still charged with passing documents is that he admitted it after five days of questioning, and he'd already told them he'd say anything just to end the questioning.
>
> If he had admitted passing pumpkin papers from the Alger Hiss case, I think he'd be charged with it.

*Id.* Following publication of this article and upon the government's motion, the district court issued a restraining order prohibiting the attorneys from talking to the media about "any aspect of [the] case that bears

upon the merits to be resolved by the jury." *Id.* at 593.

19. After concluding that the trial court's order was properly characterized as a prior restraint, *id.* at 595, the Ninth Circuit went on to analyze whether there were sufficient facts to justify the trial court's conclusion that further extrajudicial statements would pose "a serious and imminent threat to the administration of justice," *id.* at 597. In its recitation of the facts, the Ninth Circuit noted that lawyers for the defendant had indicated to the court that they might "at some future time deem it necessary in the interest of our client to make a statement outside the courtroom." *Id.* at 592. Of particular importance to the Ninth Circuit was the fact that the defense attorneys had chosen to directly attack the prosecution's case in the media "*during, or immediately before, trial.*" *Id.* at 598 (emphasis added). Quoting from the trial court's findings, the Ninth Circuit agreed that "[n]either the press nor the public has the right to hear counsel argue their case prior to this court and the impanelled jury hearing the evidence." *Id.* at 597. Finally, the court stated that "[w]hile we have focused on the article in the *Los Angeles Times,* it is apparent that this case has received widespread publicity. The district court found that the level of publicity would increase as the trial approached. We conclude that the district court's findings in this regard were appropriate." *Id.* at 598.

20. Similarly, in *United States v. Tijerina,* 412 F.2d 661, 666 (10th Cir.), *cert. denied,* 396 U.S. 990, 90 S.Ct. 478, 24 L.Ed.2d 452 (1969), the Tenth Circuit upheld a gag order because of the "'reasonable likelihood' of prejudicial news which would make difficult the impaneling of an impartial jury and tend to prevent a fair trial." In that case the defendants had made public statements to large groups. Among these statements was a boast that one of the defendants had "told the witnesses what to say and what to do." *Id.* at 665. This defendant had also charged that the judge in his case was "using the law to take vengeance and drink blood and humiliate our race." *Id.* A codefendant had said that "the United States has declared that he and his co-defendants 'are criminals and that it was going to try [them] and put

[them] to death.'" *Id.* at 665–66. Finally, the first defendant had "urged a 'march around the court house'," while his codefendant suggested "a scorched earth policy." *Id.* at 666. The Tenth Circuit concluded that such statements made "*while [the] criminal trial was pending* [were] not compatible with the concept of a fair trial." *Id.* (emphasis added); *see also In re Russell,* 726 F.2d 1007, 1010 (4th Cir.) (upholding trial court order prohibiting potential witnesses in a criminal case from discussing their proposed testimony with members of the media because of "tremendous publicity[,] the potentially inflammatory and highly prejudicial statements ..., and the relative ineffectiveness of the *considered* alternatives" (emphasis added)), *cert. denied,* 469 U.S. 837, 105 S.Ct. 134, 83 L.Ed.2d 74 (1984); *In re San Juan Star Co. (Soto v. Barcelo),* 662 F.2d 108, 116–17 (1st Cir.1981) (upholding district court order insofar as it prohibited disclosure of deposition contents to press in a pending civil rights action arising out of the shooting of two alleged terrorists because "the *community had been 'fully saturated'* by ... reports of the proceedings" and because "Puerto Rico is singularly *unsuited to a change of venue*" (emphasis added)).

21. *Cases striking down gag orders. Breiner v. Takao,* 73 Haw. 499, 835 P.2d 637, 639 (1992), involved the fourth retrial of a defendant charged with murdering his infant son. In that case, upon a prosecution motion made after advisory counsel for defendant had been seen talking to a reporter, the trial court had issued an order prohibiting the attorneys and the defendant "from making any extrajudicial statement to any member of the media relating to the trial, parties, or issues in the trial." *Id.* at 640. After noting that "extrajudicial statements of attorneys may be subject to prior restraint by a trial court upon a demonstration that the activity restrained poses a serious and imminent threat to a defendant's right to a fair trial," *id.* at 641, the Hawaii Supreme Court concluded that the trial court's order was "constitutionally impermissible," *id.* at 642. The court based its conclusion upon the fact that "the record is devoid of any evidence showing that [advisory counsel for the defendant]

made *any* statements to the media regarding the trial." *Id.* (emphasis added). Further, the court noted that the *trial court had made no findings* indicating that a gag order was the least restrictive alternative. *Id.*

22. In *Kemner*, 97 Ill.Dec. at 455, 492 N.E.2d at 1328, the Illinois Supreme Court considered the propriety of a gag order issued in twenty-two consolidated cases involving claims for injuries and property damage resulting from exposure to dioxin following a train derailment. About a month after the trial had started, the National Institute of Occupational Safety and Health (NIOSH) held a press conference in St. Louis, Missouri, at which officials announced that a former truck driver had developed a rare form of cancer possibly linked to dioxin exposure at three separate St. Louis trucking terminals. *Id.* at 458, 492 N.E.2d at 1331. In response to this news conference, and while the case against it was proceeding in St. Clair County, Illinois, Monsanto (the defendant corporation) issued a press release in which it stated:

> We have no involvement in the truck terminal issue per se. But we are currently a defendant in a lawsuit in St. Clair County, Illinois, in which several residents of Surgeon, Mo., claim they are suffering or will in the future suffer health problems from alleged exposure to dioxin stemming from a 1979 train derailment and chemical spill.
>
> The jury, which is presently hearing this case, is *not* sequestered, i.e., they are free to view and listen to local news reports. Obviously we're concerned that the jurors may have heard or read some of the exaggerated NIOSH pronouncements stemming from the March 1 news conference.... We ... hope that by calling your attention to the basic facts that relate specifically to the March 1 NIOSH announcement, we can sensitive you to the need to be careful, responsible and accurate in the way dioxin subjects are reported in the future.

*Id.* Soon after this press release, an article appeared in the *Belleville News Democrat* entitled "Monsanto Takes Aim at Government Report." *Id.* This article discussed the NIOSH news conference, the information contained in Monsanto's press release, and the St. Clair County litigation. *Id.*

23. The Illinois Supreme Court stated that, to withstand constitutional scrutiny, the gag order would have to "fit within one of the narrowly defined exceptions to the prohibition against prior restraints," such that disclosure of further information about the pending litigation would substantially affect the parties' right to a fair trial. *Id.* at 463, 492 N.E.2d at 1336. An Illinois appellate court had upheld the gag order, relying on the fact that Monsanto had in its press release specifically referred to the St. Clair County litigation as its rationale for providing information to the press and had noted its vested interest in ensuring that jurors in that litigation were not given a biased view of the effects of dioxin. *Id.* at 464, 492 N.E.2d at 1337. On this basis the appellate court concluded that Monsanto had distributed the press release with the intent to influence jurors. *Id.* The Illinois Supreme Court disagreed with the lower court and held that there were insufficient facts to sustain the gag order. *Id.* The court specifically noted that the *plaintiffs had not demonstrated that any juror had even read* the *Belleville News Democrat* story, concluding that mere "possibilities" were insufficient to justify a prior restraint.

24. Finally, in *Chase v. Robson*, 435 F.2d 1059, 1061–62 (7th Cir.1970) (per curiam), the Seventh Circuit Court of Appeals issued a writ of mandamus striking down a pretrial order that prohibited attorneys and defendants in a pending criminal trial from making any public statements regarding the case. The court held that "whether approached on its individual bases or construed as a whole, [the order] is devoid of sufficient findings to satisfy either the 'clear and present danger' or 'reasonable likelihood' tests of a 'serious and imminent threat to the administration of justice.'" *Id.* at 1061. The facts in *Chase* were set out by the district court in *United States v. Chase*, 309 F.Supp. 430 (N.D.Ill. 1970), *mandamus granted and appeal dismissed sub nom. Chase v. Robson*, 435 F.2d 1059. *Chase* involved the indictment of several defendants for allegedly destroying government records and hindering the adminis-

tration of the Military Selective Service Act. *Id.* at 432. The trial court had based its restrictive order on the observation that the defendants had sought publicity by contacting the press and issuing press releases. The court relied upon accounts in articles the defendants had appended to a motion for a continuance. Even though the majority of the articles reviewed by the court appeared in newspapers published outside the Northern District of Illinois, and although the last article involving the defendants was published almost one year before the projected beginning of the trial, the trial court concluded that an order prohibiting communication with the media by trial participants was necessary. *Id.* at 437. In justifying its order, the court also noted the association of one defense counsel with an attorney not involved in the case but whom the trial judge considered to have "repeatedly and brazenly transgressed the local rules" regarding extrajudicial statements. *Id.* at 436.

25. The Seventh Circuit concluded that newspaper articles that had been *published outside the jurisdiction* more than *seven months before the gag order was issued* and association by one of defendant's counsel with another attorney not involved in the pending criminal matter were irrelevant. *Chase*, 435 F.2d at 1061 & n. 1. While the Seventh Circuit agreed that cases should be tried in the courts rather than in the media, it did not agree that the trial court had found specific facts sufficient to justify a complete ban on all further speech. *Id.* *See also Davenport v. Garcia*, 834 S.W.2d 4, 10, 11 (Tex.1992) (holding that there must be "specific findings supported by evidence that (1) an imminent and irreparable harm to the judicial process will deprive litigants of a just resolution of their dispute, and (2) the judicial action represents the least restrictive means to prevent that harm," and striking down gag order because it *failed to identify* any miscommunication, did not indicate any specific harm to the judicial process, and did not indicate why any harm caused by further statements could not be remedied by less drastic measures).

■ 26. *The findings in this case did not warrant imposition of a gag order.* The gag order issued in this case contains no specific findings to support the generalized conclusion that "extrajudicial statements ... must be restricted by this Court to protect the RIGHT of BOTH the Defendant AND the citizenry of New Mexico to fair and impartial JURY trial(s)." The court nowhere laid out the factual foundation for finding a substantial likelihood of prejudice or clear and present danger to a fair and impartial trial. The order merely draws the conclusion that "Counsel for both sides have made numerous extrajudicial statements to the media and in public fora which they knew—or reasonably should [have known—] will have a SUBSTANTIAL LIKELIHOOD of MATERIALLY PREJUDICING ... JURY trial(s) in this case." The order does not contain any analysis of the facts supporting the court's conclusion that a gag order was necessary. Nor does the order indicate that the court considered alternatives less restrictive of free speech rights than an outright ban on all communication with the media—what may not be said, when it may not be said, where it may not be said, who may not say it, and why less restrictive alternatives would not suffice.

27. Unlike the defendant in *Sheppard*, House was not to be tried where a majority of the publicity was generated. News stories published at the time of jury selection in House's first trial suggest that despite the tremendous amount of publicity the case had received in Albuquerque, residents of Taos, where House's first and second trials were held, knew almost nothing about the case. *See* Ed Asher, *Gordon House? Who's That? Taos Asks*, Albuquerque Trib., June 7, 1994, at A1. Further, the court, attorneys for the State, and attorneys for House had used another tool to combat potential prejudice caused by pretrial publicity—extensive voir dire—which also was available for use in the third trial. Jurors in House's first trial were selected from a venire of ninety persons. These ninety persons were questioned at length about their opinions on drinking and driving, migraine headaches, possible prejudices against Native Americans, and what they knew and thought about Gordon House. Leslie Linthicum, *Potential House Jurors Questioned*, Albuquerque J., June 7, 1994, at C3.

28. *Conclusion.* We conclude that to have allowed the gag order to stand in the face of a complete lack of factual findings to support the conclusion that such an order was necessary to preserve the parties' right to a fair trial would have done serious injustice to the principle that post-speech remedies are favored over prior restraints. For the foregoing reasons we issued our writ of superintending control vacating the gag order entered by the trial court.

29. **IT IS SO ORDERED.**

FROST, C.J., and BACA, FRANCHINI and MINZNER, JJ., concur.