FILED
United States Court of Appeals
Tenth Circuit

May 6, 2008

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

GORDON HOUSE,

        Petitioner-Appellant,

v.

TIM HATCH, Warden,[*] Guadalupe
County Correctional Facility, and
ATTORNEY GENERAL FOR
THE STATE OF NEW MEXICO,

        Respondents-Appellees.

No. 05-2129

---

**Appeal from the United States District Court
for the District of New Mexico
(D.C. No. 02-cv-00178)**

---

William J. Friedman, Esq., Covington & Burling, Washington, D.C., for
Petitioner-Appellant.

Steven S. Suttle, Assistant Attorney General, State of New Mexico (Patricia A.
Madrid, Attorney General, State of New Mexico, with him on the brief),
Albuquerque, New Mexico, for Respondents-Appellees.

---

Before **MURPHY**, Circuit Judge, **BRORBY,** Senior Circuit Judge, and
**HOLMES**, Circuit Judge.

---

     [*]     Pursuant to Fed. R. App. P. 43(c)(2), we substitute the current
Warden, Tim Hatch, for Erasmo Bravo as lead party respondent.

**HOLMES**, Circuit Judge.

---

Petitioner-Appellant Gordon House, a member of the Navajo nation, was convicted in Doña Ana County, New Mexico, of driving while intoxicated, vehicular homicide, and various other charges stemming from a tragic automobile accident. After exhausting his appeals in the New Mexico state courts, Mr. House filed a petition for habeas relief in the United States District Court for the District of New Mexico pursuant to 28 U.S.C. § 2254. Based in part on the magistrate judge's findings and conclusions, the federal district court denied his habeas petition. We have jurisdiction to review Mr. House's claims under 28 U.S.C. § 2253, and we **AFFIRM**.

## I.    BACKGROUND

Because the state courts described the facts of this case in detail, we only summarize the facts pertinent to our inquiry. On Christmas Eve 1992, while driving east in the westbound lane of Interstate 40 in Bernalillo County, New Mexico, Mr. House collided with an oncoming car. *State v. House*, 978 P.2d 967, 972-73 (N.M. 1999) ("*House I*"). The head-on collision instantly killed Melanie Cravens and her three daughters, and seriously injured her husband, Paul Cravens. *Id*. at 973. Also injured, Mr. House was taken to the hospital, where his blood-alcohol concentration was measured at 0.18%. *Id*. Mr. House admitted that during the evening he had consumed seven-and-one-half beers. *Id*. at 972.

2

Officers arrested Mr. House and he was charged with one count of driving while intoxicated ("DWI"); one count of reckless driving; one count of great bodily injury by vehicle; and four counts of vehicular homicide, on the alternative theories of DWI and reckless driving. *Id*. at 973.

The accident and ensuing prosecution received continual and extensive media attention owing to allegations that the prosecution was motivated by Mr. House's ethnicity. *See id.* at 972, 989-1001 (documenting the extent and nature of the media coverage surrounding Mr. House's prosecution); *see also Twohig v. Blackmer*, 918 P.2d 332, 334 (N.M. 1996) (ruling that gag order prohibiting parties in Mr. House's prosecution from speaking with media was an unconstitutional prior restraint on speech, and quoting Mr. House's counsel as stating, "[I]f Gordon House was not Native American and if the victims were not Anglos, despite tragedy, [this case] would not have received any where near the kind of media attention it has generated."). Allegations of racial bias reached their pinnacle when the district attorney announced a plan to pursue first-degree, depraved-mind murder charges against Mr. House. *Twohig*, 918 P.2d at 334.[1] The media attention was so pervasive that the prosecution claimed that the State was having difficulty trying its case. *House I*, 978 P.2d at 972.

---

[1] The first-degree murder charges were eventually dismissed after an evidentiary hearing. *House I*, 978 P.2d at 973.

3

Due to the extensive publicity, a Bernalillo County district court granted Mr. House's unopposed motion to transfer venue to Taos County. *Id*. at 974. On June 21, 1994, a jury convicted Mr. House on the misdemeanor charge of DWI, but deadlocked on the remaining counts. *Id*. After the trial court declared a mistrial, the State filed a motion for a change of venue due to the continuing publicity. *Id*. Mr. House objected, and the trial court overruled the motion. *Id*.

On November 7, 1994, a second jury trial began in Taos County. *Id*. Again, the jury deadlocked in favor of conviction on the vehicular homicide counts and another mistrial was declared. *Id*. Seeking a third trial, the State moved for a change of venue to Bernalillo County. *Id*. After holding a hearing on the change-of-venue motion, the trial court granted the State's motion for a venue change concluding that local excitement and prejudice generated by the two mistrials and the extensive publicity surrounding the case meant that neither side could get a fair trial. *Id*. But, after an extensive analysis regarding the best alternative venue, the trial court transferred the case to Doña Ana County rather than Bernalillo County. *Id*. at 974-75.

Mr. House's third jury trial began on May 5, 1995, and was broadcast nationwide on Court TV. *Id*. at 975. On May 26, 1995, after deliberating under five hours, the Doña Ana jury convicted Mr. House on all charges: four counts of vehicular homicide (on a DWI theory); four counts of vehicular homicide (on a reckless driving theory); one count of great bodily injury by vehicle (DWI); and

4

one count of great bodily injury by vehicle (reckless driving). *Id.* On July 24, 1995, the trial court sentenced Mr. House to a prison term of twenty-five years, suspending three of those years. *Id.*; *see State v. House*, 25 P.3d 257, 260 (N.M. Ct. App. 2001) (*"House II"*).[2] The New Mexico Supreme Court affirmed Mr. House's conviction. *House I*, 978 P.2d at 998.

While his case was on direct appeal, the New Mexico Court of Appeals issued an opinion holding that, under constitutional double jeopardy principles, vehicular-homicide convictions could not be imposed on alternative theories for the same deaths. *See generally State v. Landgraf*, 913 P.2d 252, 262 (1996). After the New Mexico Supreme Court denied a writ of certiorari the following month, *Landgraf* became final and binding. Consequently, the trial court resentenced Mr. House, vacating the four vehicular homicide counts predicated on a reckless-driving theory, but leaving the twenty-five-year sentence intact. *See House II,* 25 P.3d at 261. Mr. House appealed. The New Mexico Court of

---

[2] The trial court imposed a sentence of three years on one count of grievous bodily injury with a motor vehicle. *House II*, 25 P.3d at 260. It retained the vehicular homicide convictions predicated on alternative theories, imposing three years for each of the eight counts of vehicular homicide – four based on a DWI theory and four based on a reckless driving theory – to be served concurrently for a total of twelve years. *Id.* Finally, because Mr. House had a previous misdemeanor DWI conviction, the trial court imposed a statutory two-year recidivist enhancement upon each of his DWI-related convictions for a total of ten years. *Id.* Mr. House, therefore, received a total sentence of twenty-five years, with three years suspended. *See, e.g.*, R., Vol. I, Doc. 9 (Resp.'s Answer, filed March 20, 2002), Exhibit P, at 8 (Amended Judgment, Partially Suspended Sentence and Commitment, filed April 6, 1999).

5

Appeals upheld his sentence, *id.* at 267, and the New Mexico Supreme Court denied a writ of certiorari.

While his sentencing appeal was pending, Mr. House filed a petition for habeas relief in the United States District Court for the District of New Mexico. The federal district court dismissed the petition without prejudice because Mr. House had not exhausted his state court remedies. At the conclusion of state proceedings, Mr. House filed a second petition for habeas relief.

The magistrate judge recommended denying Mr. House's petition on the merits. Although the district court only partially adopted the magistrate judge's findings and conclusions, it reached the same result, denying on the merits Mr. House's petition for habeas relief. Mr. House appealed and, on July 25, 2005, the district court issued a certificate of appealability.

## II.   STANDARD OF REVIEW

"'In an appeal of the dismissal of a federal habeas corpus petition, we review a district court's findings of fact for clear error and its conclusions of law de novo.'" *Maynard v. Boone*, 468 F.3d 665, 669 (10th Cir. 2006) (quoting *Robinson v. Golder*, 443 F.3d 718, 720 (10th Cir. 2006), *cert. denied*, 127 S. Ct. 166 (2006)), *cert. denied*, 127 S. Ct. 1819 (2007). The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") establishes the requirements for granting a writ of habeas corpus:

> An application for a writ of habeas corpus on behalf of a

6

person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in the State court proceedings unless the adjudication of the claim –

    (1)    resulted in a decision that was *contrary to, or involved an unreasonable application of, clearly established Federal law*, as determined by the Supreme Court of the United States; or

    (2)    resulted in a decision that was based on an *unreasonable determination of the facts* in light of the evidence presented in the State court proceeding.

28 U.S. C. § 2254(d) (emphasis added).  Subsection (d)(1) governs claims of legal error while subsection (d)(2) governs claims of factual error.  *See Maynard*, 468 F.3d at 669.

### A.    Section 2254(d)(1)

#### 1.    Clearly established law

The AEDPA "requires federal habeas courts to deny relief that is contingent upon a rule of law not clearly established at the time the state court conviction became final."  *Williams v. Taylor*, 529 U.S. 362, 380 (2000).  Whether the law is clearly established is *the* threshold question under § 2254(d)(1).  *Id.* at 390 (emphasis added); *see also Yarborough v. Alvarado*, 541 U.S. 652, 660 (2004) (the analysis "begin[s] by determining the relevant clearly established law").  Clearly established law is determined by the United States Supreme Court, and refers to the Court's "holdings, as opposed to the dicta."  *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003) (internal quotation marks omitted)

7

(quoting *Williams*, 529 U.S. at 412). The law is not clearly established if it announces "[a] rule that 'breaks new ground or imposes a new obligation on the States of the Federal Government.'" *Williams* at 381 (quoting *Teague v. Lane*, 489 U.S. 288, 301 (1989)).

The Court recently clarified at least two significant issues that were raised by federal court application of the *Williams* analytic framework. *Carey v. Musladin*, 127 S. Ct. 649 (2006).[3] First, *Musladin* instructed that Supreme Court holdings – the exclusive touchstone for clearly established federal law – must be construed narrowly and consist only of something akin to on-point holdings.

Prior to *Musladin*, the Supreme Court seemed more likely to draw clearly established federal law from general principles teased from precedent. In *Alvarado*, *supra*, for example, where the petitioner alleged that he was subjected to an unlawful custodial interrogation because he was not read his *Miranda* rights, the Court discerned clearly established federal law in the general principles of *Miranda* and its progeny, even though those cases were silent concerning the

---

[3] In *Wright v. Van Patten*, 128 S. Ct. 743, 745 (2008) (per curiam), the Court seemed to acknowledge that more was at work in *Musladin* than a routine restatement of the § 2254(d)(1) standard of review because, prior to its final decision, it remanded the case to the Seventh Circuit for further consideration in light of "*Musladin's* explanation of the 'clearly established Federal law' requirement." *Id.* at 745. *See Rodriguez v. Miller*, 499 F.3d 136, 140 (2d Cir. 2007), (noting that "[t]he Supreme Court has vacated our decision in this habeas proceeding with the instruction to reconsider it in light of" *Musladin)*, *cert. denied*, 76 U.S.L.W. 3497 (U.S. Mar. 17, 2008).

8

effect of the two criminal-suspect variables at issue – age and experience with law enforcement – on the custody analysis. 541 U.S. at 661-63, 666; *see Andrade*, 538 U.S. at 71-72 (where Supreme Court precedent was "not a model of clarity" and the Court had "not established a clear or consistent path for courts to follow" Court nonetheless found general, clearly established law – *viz.*, "A gross disproportionality principle is applicable to sentences for a term of years.")*; see also* Melissa M. Berry, *Seeking Clarity in the Federal Habeas Fog: Determining What Constitutes "Clearly Established" Law under the Antiterrorism and Effective Death Penalty Act*, 54 CATH. U. L. REV. 747, 787 (2005) ("The Court's [pre-*Musladin*] decisions . . . demonstrate that it will not find a lack of clearly established law where it can discern a legal principle in the Court's precedent, even if that principle is general or otherwise indeterminate.").[4] Under the pre-*Musladin* regime, the Court observed that in "most situations, . . . the task of determining what we have clearly established will be straightforward." *Andrade*, 538 U.S. at 72.

In contrast, the *Musladin* Court's articulation of what constitutes clearly established law is noticeably more restrictive:

---

[4]    *Compare Andrade*, 538 U.S. at 71-72 (describing clearly established federal law as "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision") *with* Berry, *supra*, at 782 (discussing *Andrade* and noting "[t]his lack of clarity [in Supreme Court holdings], therefore, did not mean that there was no clearly established law; it was not a dispositive issue for the Court").

9

Given the lack of holdings from this Court regarding the potentially prejudicial effect of spectators' courtroom conduct of the kind involved here, it cannot be said that the state court "unreasonabl[y] appli[ed] clearly established Federal law." § 2254(d)(1). No holding of this Court required the California Court of Appeal to apply the test of *Williams* and *Flynn* [Supreme Court cases involving government-sponsored practices] to the spectators' conduct here. Therefore, the state court's decision was not contrary to or an unreasonable application of clearly established federal law.

127 S. Ct. at 654. Thus, in the post-*Musladin* analysis, clearly established law consists of Supreme Court holdings in cases where the facts are at least closely-related or similar to the case *sub judice*. Although the legal rule at issue need not have had its genesis in the closely-related or similar factual context, the Supreme Court must have expressly extended the legal rule to that context.[5] *See Wright v.*

---

[5] Notably, the *Musladin* Court did not appear to predicate the presence of clearly established federal law upon the existence of Supreme Court holdings involving essentially identical factual circumstances. In other words, the Court did not insist upon exact factual identity between existing Supreme Court cases and the case *sub judice*. For example, the Court did not focus on the precise nature of the privately-initiated courtroom conduct at issue – the wearing of buttons bearing the likeness of the deceased. Rather, in referring to "courtroom conduct of *the kind involved here*," the Court seemingly distinguished between the allegedly prejudicial effect of government-sponsored, as opposed to privately-initiated, courtroom conduct. *Musladin*, 127 S. Ct. at 654 (emphasis added); *see id.* at 653 (noting the "contrast" between its existing precedent that involved "state-sponsored courtroom practices" and the conduct "to which Musladin objects" that related to "private-actor courtroom conduct"); *see also Van Patten*, 128 S. Ct. at 745 (per curiam) (highlighting the government-sponsored/privately-initiated courtroom conduct distinction in describing *Musladin*'s holding). Arguably then, had a prior Supreme Court holding involved the prejudicial effect of privately-initiated courtroom conduct – even if that conduct was *unrelated* to the wearing of buttons – the Court would likely have concluded that clearly

(continued...)

10

*Van Patten*, 128 S. Ct. 743, 746 (2008) (per curiam) (consistent with *Musladin*

reversing a grant of habeas relief under the rationale that no Supreme Court

decision "squarely address[ed]" the issue "or clearly establish[ed]" that law from

another context should apply on the facts *sub judice*); *see also Rodriguez v.*

*Miller*, 499 F.3d 136, 140 (2d Cir. 2007), ("[*Musladin*] admonishe[d] courts to

read the Supreme Court's holdings narrowly and to disregard as dicta . . . much of

the underlying logic and rationale of the high court's decisions."), *cert. denied*, 76

U.S.L.W. 3497 (U.S. Mar. 17, 2008).

Second, *Musladin* clarified that the threshold determination that there is no

clearly established federal law is analytically dispositive in the § 2254(d)(1)

analysis. That is, without clearly established federal law, a federal habeas court

---

[5](...continued)
established federal law existed.

Consequently, *Musladin*'s narrowing of the universe of Supreme Court
holdings that qualify, in any given case, as clearly established federal law obliges
federal courts to engage in a type of line-drawing. In the post-*Musladin* world, it
is not enough for courts to mechanistically seek to determine whether there are
Supreme Court holdings that involve facts that are indistinguishable from the case
at issue. Instead, they must exercise a refined judgment and determine the actual
materiality of the lines (or points) of distinction between existing Supreme Court
cases and the particular case at issue (for example, the *Musladin* line between the
allegedly prejudicial effect of government-sponsored, and privately-initiated,
courtroom conduct). *Cf. Rodriguez*, 499 F.3d at 142 (where petitioner objected to
the exclusion of his family from his criminal trial, the court in applying *Musladin*
did not insist upon factual identity, but rather looked for a Supreme Court holding
that provided "a rule of general application in the courtroom closure context").
However, federal courts may no longer extract clearly established law from the
general legal principles developed in factually distinct contexts.

11

need not assess whether a state court's decision was "contrary to" or involved an "unreasonable application" of such law. *See The Supreme Court, 2006 Term – Leading Cases*, 121 HARV. L. REV. 335, 340 (2007) (noting that in *Musladin* the threshold question was "both the beginning and the end" of the analysis).

Prior to *Musladin*, there was uncertainty regarding whether the *Williams* Court's reference to a "threshold" question "simply mean[t] the issue should be addressed first, or whether it also mean[t] the issue should be dispositive and thus the basis for denying relief." Berry, *supra*, at 753; *see also The Supreme Court, 2006 Term – Leading Cases*, *supra*, at 340 (noting that prior to *Musladin* the courts were "divided" over whether the threshold question "should also be dispositive" ). *Cf.* Kent S. Scheidegger, *Habeas Corpus, Relitigation, and the Legislative Power*, 98 COLUM. L. REV. 888, 949 (1998) (pre-*Williams*, rejecting the view of some commentators that an "unreasonable application" inquiry was appropriate in the absence of clearly established federal law, stating, "Application is not extrapolation. If there were no clearly established law governing the situation, then nothing the state court did could possibly be an unreasonable application of nonexistent law.").

Our decisions have reflected this lack of clarity. In *Valdez v. Ward*, 219 F.3d 1222 (10th Cir. 2000), we strongly suggested that a habeas court was obliged to proceed to the "bifurcated inquiry" under § 2254(d)(1) (i.e., the "contrary to"

12

and "unreasonable application" inquiries) only if it determined that there was clearly established federal law. *Id*. at 1229 ("[T]he threshold question is whether the petitioner seeks to apply a rule of law that was 'clearly established' by the Supreme Court at the time the conviction became final. *If so*, we must proceed to a bifurcated inquiry." (emphasis added, footnote and citation omitted)). However, in *Carter v. Ward*, 347 F.3d 860 (10th Cir. 2003), we held that even where the federal law was not clearly established a habeas court "must still consider" whether the petitioner could alternatively prevail under the "unreasonable application" prong of § 2254 (d)(1). *Id*. at 864.

*Musladin* has now dispelled the uncertainty: The absence of clearly established federal law is dispositive under § 2254(d)(1).

### 2. Contrary to or unreasonable application of clearly established federal law

After *Musladin*, only if we answer affirmatively the threshold question as to the existence of clearly established federal law, may we ask whether the state court decision is either contrary to or an unreasonable application of such law.

A state-court decision is contrary to clearly established federal law if: (a) "the state court applies a rule that contradicts the governing law set forth in Supreme Court cases"; or (b) "the state court confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and

13

nevertheless arrives at a result different from [that] precedent." *Maynard*, 468

F.3d at 669 (internal quotation marks and brackets omitted) (quoting *Williams*,

529 U.S. at 405). "The word 'contrary' is commonly understood to mean

'diametrically different,' 'opposite in character or nature,' or 'mutually

opposed.'" *Williams*, 529 U.S. at 405 (citation omitted).

A state court decision involves an unreasonable application of clearly

established federal law when it identifies the correct governing legal rule from

Supreme Court cases, but unreasonably applies it to the facts. *Id*. at 407-08.

Additionally, we have recognized that an unreasonable application may occur if

the state court either unreasonably extends, or unreasonably refuses to extend, a

legal principle from Supreme Court precedent to a new context where it should

apply. *Carter*, 347 F.3d at 864 (quoting *Valdez*, 219 F.3d at 1229-30).[6]  We refer

---

[6]     The "extension of legal principle" component is not at issue here.
Mr. House does not argue that the state court erred in refusing to extend Supreme
Court precedent in a new context.  Instead, he claims that the factual differences
between jury selection and venue selection are of no moment and, consequently,
Supreme Court equal protection precedent that applies to jury selection should
apply equally to venue selection.  In essence, Mr. House complains that the New
Mexico Supreme Court unreasonably applied that precedent.

Given our determination *infra* that no clearly established federal law
mandated the application of equal protection principles arising in the jury
selection context to the arena of venue selection, even if we were to construe Mr.
House's argument as being bottomed in any measure on the "extension of legal
principle" component, he would have no grounds for complaint: The New Mexico
state courts would have given Mr. House the extension of law that he wanted
(albeit not the outcome) by applying *Batson v. Kentucky*, 476 U.S. 79 (1986) to

(continued...)

14

to these two analytic strands, respectively, as the "application of legal principle,"
and the "extension of legal principle," *Williams*, 529 U.S. at 408-09, components
of the "unreasonable application" prong of § 2254(d)(1).[7]

As to this prong, the ultimate focus of the inquiry is whether the state
court's application of the clearly established federal law is objectively
unreasonable. *Bell v. Cone*, 535 U.S. 685, 694 (2002). Consequently, the

_____

[6](...continued)
venue selection. Furthermore, insofar as Mr. House alludes to the "extension of
legal principle" component in objecting to the conduct of the *federal* district
court, *see* Aplt. Op. Br. at 7, he is misguided. His habeas petition must
necessarily challenge the conduct of the state courts and their allegedly
"unreasonable application" of clearly established federal law. 28 U.S.C. §
2254(d)(1). The federal district courts merely provide a layer of review of state
court action. Accordingly, any inquiry as to whether the federal district court
itself could be deemed to have misapplied clearly established federal law under
the "extension of legal principle" component would be inappropriate.

[7]      The decisional boundaries between the "application of legal
principle" and the "extension of legal principle" components of the "unreasonable
application" prong are admittedly ill-defined. *See Alvarado*, 541 U.S. at 666
(Kennedy, J.) ("[T]he difference between applying a rule and extending it is not
always clear. Certain principles are fundamental enough that when new factual
permutations arise, the necessity to apply the earlier rule will be beyond doubt.");
*see also Musladin*, 127 S. Ct. at 656 (Kennedy, J., concurring in judgment)
("AEDPA does not require state and federal courts to wait for some nearly
identical factual pattern before a legal rule must be *applied*." (emphasis added));
*Williams*, 529 U.S. at 408 (noting both that "problems of precision" are associated
with the two components and that "in some cases it will be hard to distinguish a
decision involving an unreasonable extension of a legal principle from a decision
involving an unreasonable application of the law to facts"). *Cf.* Berry, *supra*, at
805 ("Under the unreasonable application prong, clearly established law includes
rules that can be reasonably extended to new factual situations that are not
materially distinguishable.").

15

Supreme Court has concluded that although this standard does not require all reasonable jurists to agree that the state court was unreasonable, an unreasonable application constitutes more than an incorrect application of federal law. *Williams*, 529 U.S. at 377, 410; *see Andrade*, 538 U.S. at 75 ("It is not enough that a federal habeas court, in its independent review of the legal question, is left with a firm conviction that the state court was erroneous." (internal quotation marks omitted)). In addressing the objective unreasonableness standard, we have determined that the AEDPA's conception of objective unreasonableness lies "somewhere between *clearly* erroneous and unreasonable to all reasonable jurists." *Maynard*, 468 F.3d at 670. Thus, "only the most serious misapplications of Supreme Court precedent will be a basis for relief under § 2254." *Id.* at 671.

### B. Section 2254(d)(2)

Under the AEDPA's second subsection governing claims of factual error, a writ of habeas corpus should be granted only if the state court decision was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d)(2). A federal habeas court must presume the state court's factual findings to be correct unless the petitioner rebuts the presumption with clear and convincing evidence. 28 U.S.C. § 2254 (e)(1). The standard "is demanding, but not insatiable . . . [as ] deference does not by definition preclude relief." *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005)

16

(internal quotation marks omitted) (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003)).

### III. LEGAL ANALYSIS

On appeal, Mr. House challenges the denial of habeas relief on five grounds. First, he contests the trial court's transfer of venue to Doña Ana County which, he contends, improperly eliminated all members of his race from the venire. Specifically, he argues that *Batson v. Kentucky*, 476 U.S. 79 (1986), "prohibits the State from offensively using state venue transfer statutes to transfer a case to a venue" with the aim of "depriving a defendant of any practical possibility that members of his race will be in the venire from which the petit jury is selected." Aplt. Op. Br. at xxiv. Furthermore, according to Mr. House, although the New Mexico Supreme Court was correct to use the framework of *Batson* to assess the legal propriety of the venue transfer in his case, it did not properly employ the *Batson* analysis.

Second, Mr. House contends that the trial court misapplied clearly established federal law when it failed to conduct voir dire before presuming that the entire Taos County venire was tainted by pretrial publicity and transferring venue. Third, Mr. House maintains that the State's discriminatory use of the New Mexico venue transfer statute constituted a structural error that violated his Fourteenth Amendment rights to equal protection and due process of law. Fourth,

17

Mr. House claims that the state court erred in its sentencing decisions in violation of his due process rights. Finally, Mr. House challenges the trial court's refusal to recuse on remand. Addressing each argument in turn, we conclude that they all lack merit.

A. **Is Mr. House entitled to habeas relief based on his claim that New Mexico violated his right to equal protection through its use of a race-neutral venue transfer statute?**

Mr. House requests habeas relief arguing that the State-initiated transfer of venue from Taos County to Doña Ana County – which allegedly eliminated Native Americans from the venire[8] – ran afoul of the Supreme Court's *Batson* decision, unlawfully depriving him of his Fourteenth Amendment rights. More generally, Mr. House maintains that various Supreme Court precedents stand for the clearly established federal legal principle that the Equal Protection Clause applies to all stages of a criminal proceeding, including the selection of venue. This principle, reasons Mr. House, bars the State from intentionally discriminating against a defendant by obtaining a transfer of venue.

"The Supreme Court in *Batson* held that the Fourteenth Amendment's Equal Protection Clause prohibits the prosecution's use of peremptory challenges to exclude potential jurors on the basis of their race." *Saiz v. Ortiz*, 392 F.3d

---

[8] Mr. House's Doña Ana County venire actually included several Native Americans whom Mr. House excused from the jury using his peremptory challenges. *House I*, 978 P.2d at 998.

18

1166, 1171 (10th Cir. 2004); *see Batson*, 476 U.S. at 86, 89 ("The Equal Protection Clause guarantees the defendant that the State will not exclude members of his race from the jury venire on account of race, or on the false assumption that members of his race as a group are not qualified to serve as jurors." (citations omitted)).

The New Mexico Supreme Court concluded that equal protection principles did apply in the context of venue transfers and employed a modified *Batson* analysis in assessing the legality of the venue transfer to Doña Ana County. Although the federal district court ultimately concluded on the merits that the New Mexico Supreme Court's equal protection analysis was not an unreasonable application of clearly established federal law, it affirmed the magistrate judge's determination that "the clearly established federal law does not extend the ruling of *Batson v. Kentucky* . . . and its progeny to the State's motion for a change of venue." Case No. CV-02-0178-MV/ACT, Doc. No. 63, at 8 (Mem. Op. & Order, dated Mar. 31, 2005) (internal quotations marks omitted) (quoting Case No. CV-02-0178-MV/ACT, Doc. 55, at 11 (Report & Recommendation, dated Jan. 23, 2004)) [hereinafter "Slip Op."].

We conclude that the federal district court reached the right result. No Supreme Court case holds that venue transfers are subject to scrutiny under the Equal Protection Clause. Absent controlling Supreme Court precedent, it follows

19

ineluctably that the New Mexico Supreme Court's decision to uphold the venue transfer cannot be either "contrary to, or [] an unreasonable application of, clearly established Federal law." 28 U.S.C. § 2254(d)(1).

*Musladin* is instructive. There, the California Court of Appeal held that the courtroom conduct of the victim's family, in wearing buttons displaying the victim's image, was not unconstitutionally prejudicial so as to deny the defendant his right to a fair trial. 127 S. Ct. at 652. The Supreme Court concluded that, in contrast to state-sponsored courtroom practices that affect a defendant's right to a fair trial, the prejudicial effect of privately-initiated spectator courtroom conduct is "an open question" in Supreme Court jurisprudence. *Id*. at 653. Thus, the state court could not have unreasonably applied clearly established federal law. *Id*. at 654.

Like the spectator conduct at issue in *Musladin*, the Supreme Court has never addressed a claim that a state-initiated transfer of venue denied a defendant equal protection under the Fourteenth Amendment. Thus, whether the Equal Protection Clause applies to the selection of venue is an "open question" under the Supreme Court's jurisprudence.[9] Indeed, when faced with the precise issue,

---

[9] Mr. House argues that the New Mexico Supreme Court's application of *Batson* to venue transfers demonstrates that it is clearly established law. However, the New Mexico Supreme Court did not determine that Supreme Court holdings established that *Batson* applied to venue transfers. Rather, the court found that "[t]here is no generally accepted test for evaluating discriminatory

(continued...)

20

the Supreme Court denied a petition for certiorari. *See Mallett v. Missouri*, 494

U.S. 1009, 1010 (1990) (Marshall, J., dissenting) (noting that petition for

certiorari should have been granted to determine whether trial court's decision to

transfer capital trial of African-American defendant to county with no residents of

defendant's race violates Equal Protection Clause or the Sixth Amendment's fair

cross-section requirement).  Mr. House correctly points out that a denial of

certiorari does not constitute a ruling on the merits.  However, it does

demonstrate at least in this instance that the issue remains unresolved by the

Supreme Court.  And, perforce, that tells us that there is no clearly established

law on the subject.  *See*  Berry, *supra*, at 791 ("The most straightforward case [of

a lack of clearly established law] is where the Supreme Court has expressly

declined to decide an issue.").

We likewise reject Mr. House's attempt to extrapolate clearly established

law from general equal protection principles in the absence of a Supreme Court

holding on point.  Although we acknowledge the long line of Supreme Court

---

[9](...continued)
intent in the selection of a venue." *House I*, 978 P.2d at 993.  More
fundamentally, the New Mexico Supreme Court's conclusion that a modified
*Batson* analysis could apply to an alleged discriminatory venue transfer does not
make *Batson* "clearly established federal law" on the issue.  As the federal district
court correctly noted, "[u]nlike federal district courts considering habeas writs,
state courts are not required to apply only 'clearly established federal law' on
direct appeal, rather they apply Supreme Court decisions employing their own
interpretation and analysis."  Slip Op. at 7.

21

cases that stand for the proposition that a state may not purposefully discriminate on the basis of race in jury selection procedures,[10] we nonetheless must heed *Musladin*'s teachings that restrict the scope of clearly established federal law to narrowly-defined Supreme Court holdings. To demonstrate that the law is clearly established, Mr. House must do more than identify a generalized legal principle.

Because the federal law is not clearly established that equal protection guarantees apply to the state's selection of a trial venue, we conclude that the New Mexico Supreme Court's decision was neither contrary to, nor an unreasonable application of, clearly established law. Consequently, Mr. House is not entitled to habeas relief on this ground.

**B.      Whether Mr. House is entitled to habeas relief because the**

---

[10]      Undoubtedly, for over a century the Supreme Court has battled racial discrimination in the procedures used to select the venire from which individual jurors are drawn. *See Strauder v. West Virginia*, 100 U.S. 303, 310 (1880) (holding that a state denies a defendant equal protection when it purposefully excludes all members of the defendant's race from being eligible to serve as jurors), *abrogated on other grounds by Taylor v. Louisiana*, 419 U.S. 522 (1975); *Ex Parte Virginia*, 100 U.S. 339 (1880); *see also Georgia v. McCollum*, 505 U.S. 42, 46 (1992) ("Over the last century, in an almost unbroken chain of decisions, this Court gradually has abolished race as a consideration for jury service."); *Powers v. Ohio*, 499 U.S. 400, 404 (1991) ("For over a century, this Court has been unyielding in its position that a defendant is denied equal protection of the laws when tried before a jury from which members of his or her race have been excluded by the State's purposeful conduct."); *Holland v. Illinois*, 493 U.S. 474, 477 (1990) ("[T]he Sixth Amendment entitles every defendant to object to a venire that is not designed to represent a fair cross section of the community."); *Batson*, 476 U.S. at 86 ("Purposeful racial discrimination of the venire violates a defendant's right to equal protection because it denies him the protection that a trial by jury is intended to serve.").

22

**New Mexico Supreme Court improperly applied *Batson*?**

Mr. House challenges the New Mexico Supreme Court's modified *Batson* analysis relating to the venue transfer to Doña Ana County as an unreasonable application of clearly established federal law under the Equal Protection Clause. Because there is no clearly established federal law entitling Mr. House to the safeguards afforded by that constitutional provision when the State initiates a venue transfer, Mr. House's challenge fails at the threshold inquiry. Under § 2254(d)(1) our analysis ends.[11]

> **C.** **Is Mr. House entitled to habeas relief because the trial court failed to voir dire potential Taos County jurors prior to transferring venue?**

Mr. House argues that the trial court violated his Sixth and Fourteenth Amendment rights when it transferred venue without ascertaining, through voir dire, whether potential jurors were actually prejudiced instead presuming that, after two mistrials, a fair and impartial jury could not be seated in Taos County. The New Mexico Supreme Court, reversing the New Mexico Court of Appeals,

---

[11]    Mr. House also argues that the New Mexico Supreme Court misapplied the more general governing legal principle to be gleaned from Supreme Court precedent – specifically, that the Equal Protection Clause applies at every step of a criminal proceeding. Given the teachings of *Musladin* discussed *supra*, we may summarily reject Mr. House's argument; such a general governing legal principle cannot properly comprise clearly established federal law and, absent such law, our inquiry ends.

23

held that neither the New Mexico constitution, statutes, nor case law requires that "a venue change should be supported by proof of actual prejudice through voir dire." *House I*, 978 P.2d at 984. Moreover, the New Mexico Supreme Court determined that the trial court had not abused its discretion when, after conducting an extensive evidentiary hearing, it found that it was improbable that a fair and impartial jury could be assembled at that time in Taos County. *Id.* at 990.

Although Mr. House conflates his arguments concerning legal and factual error, we analyze them separately. First, Mr. House alleges that it is clearly established federal law that voir dire is required before granting a change of venue on the grounds that the entire venire is prejudiced. Consequently, he argues that the New Mexico Supreme Court's decision was contrary to, or involved an unreasonable application of, this clearly established federal law. As explained *supra*, a claim of legal error is governed by § 2254(d)(1). Second, Mr. House alleges that the trial court's presumption of prejudice was an unreasonable determination of the facts in light of the evidence. Because this claim asserts a factual error, we analyze it under § 2254(d)(2).

### 1. Clearly established federal law under § 2254(d)(1)

The Supreme Court has determined that intense pretrial publicity may create either presumed prejudice or actual prejudice in a jury pool. The Supreme

24

Court expressly articulated these concepts, in *Murphy v. Florida*, 421 U.S. 794 (1975), holding that "Petitioner has failed to show that the setting of the trial was inherently prejudicial *or* that the jury selection process of which he complains permits an inference of actual prejudice." *Id.* at 803 (emphasis added).[12]

We have acknowledged the distinction between presumed and actual prejudice, and observed that prejudice is presumed where "pretrial publicity is so pervasive and prejudicial that we cannot expect to find an unbiased jury pool in the community." *Goss v. Nelson*, 439 F.3d 621, 628 (10th Cir. 2006). In such cases, a trial court is permitted to transfer venue without conducting voir dire of prospective jurors. *See Sheppard v. Maxwell*, 384 U.S. 333, 362-63 (1966) ("[W]here there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial, the judge should continue the case until the threat abates, or transfer it to another county not so permeated with publicity."); *Estes v. Texas*, 381 U.S. 532, 542-43 (1965).

Actual prejudice "manifest[s] at jury selection" when voir dire reveals "the effect of pretrial publicity . . . is so substantial as to taint the entire jury pool." *Goss*, 439 F.3d at 628. To establish actual prejudice, the party seeking a change

---

[12]     *See also Sheppard v. Maxwell*, 384 U.S. 333 (1966); *Estes v. Texas*, 381 U.S. 532 (1965); *Rideau v. Louisiana*, 373 U.S. 723 (1963); *Irving v. Dowd*, 366 U.S. 717 (1961). "In each of these cases, th[e] [Supreme] Court overturned a state-court conviction obtained in a trial atmosphere that had been utterly corrupted by press coverage." *Murphy*, 421 U.S. at 798.

of venue must demonstrate "the actual existence of [] an opinion in the mind of the juror as will raise the presumption of partiality." *Murphy*, 421 U.S. at 800 (internal quotation marks omitted) (quoting *Irwin*, 366 U.S. at 723). In cases of actual prejudice, "the voir dire testimony and the record of publicity [] [must] reveal the kind of wave of public passion that would have made a fair trial unlikely by the jury that was empaneled as a whole." *Patton v. Yount*, 467 U.S. 1025, 1040 (1984).

Conceding that the Supreme Court "recognizes two means of demonstrating" that pretrial publicity has prejudicially impacted potential jurors' ability to be fair and impartial, Aplt. Op. Br. at 29, Mr. House nonetheless argues that the only effective means of establishing juror prejudice that will justify a venue change is voir dire.[13] However, the Supreme Court has never determined

---

[13] We also could construe Mr. House as contending that to protect against the dangers of "purposeful state action to exclude members of Defendant's race from the venire," Aplt. Op. Br. at 48, a trial court must voir dire potential jurors in a case in which the prosecution requests a venue change because of pervasive pretrial publicity, at least where the factual circumstances raise the specter of possible race-based discrimination (e.g., where the requested venue has few potential jurors of defendant's race). Even if we construed Mr. House's argument to encompass this contention, however, we would reject it. We already have concluded that under clearly established federal law Mr. House did not have a right to be protected from alleged state race-based venue transfer requests. Accordingly, clearly established federal law perforce would not have obliged state courts to engage in voir dire to guard against damage to this nonexistent substantive right.

Mr. House urges us to read *Mu'Min v. Virginia*, 500 U.S. 415 (1991),
(continued...)

26

that a trial court must conduct voir dire before granting a motion for a change of venue due to pretrial publicity. Indeed, as evident by the discussion above, clearly established Supreme Court precedent dictates that, under certain circumstances, pretrial publicity may be presumed to prejudice prospective jurors. In such cases, voir dire is not a condition precedent to transferring venue. Thus, Mr. House's contention fails § 2254(d)(1)'s threshold inquiry: there is no clearly established federal law to support it. Consequently, the New Mexico Supreme Court's conclusion that the law does not require "a venue change [] be supported by proof of actual prejudice through voir dire," *House I*, 978 P.2d at 984, cannot be contrary to, or an unreasonable application of, clearly established federal law.

Moreover, the New Mexico Supreme Court relied on its construction of state law that "the choice of waiting until after voir dire before granting a motion to change venue rests with the sound discretion of the trial court and will not be disturbed absent an abuse of that discretion." *Id*. On collateral review, we cannot

---

[13](...continued)
"as establishing that voir dire transcripts are required to sustain any determination of community wide prejudice." Aplt. Op. Br. at 26. We decline to do so. Simply put, *Mu'Min* is inapposite. There, the Court held that the Constitution does not mandate content-based voir dire regarding a potential juror's exposure to pretrial publicity. *Id*. at 424. *Mu'Min* does not speak to whether a trial court, in ruling on the prosecution's motion to change venue, may presume juror prejudice from extensive pretrial publicity. More specifically, it does not purport to address under what circumstances a trial court might be obliged to conduct a voir dire examination of potential jurors to protect against the alleged prejudice of pretrial publicity.

27

review a state court's interpretation of its own state law. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).

Accordingly, for the foregoing reasons, Mr. House's constitutional challenge to the state trial court's failure to conduct voir dire before effecting the venue transfer must fail.

### 2. Unreasonable determination of the facts under § 2254(d)(2)

Mr. House further contends that both the trial court and the New Mexico Supreme Court misapprehended the quality and quantity of the pretrial publicity in this case. In his view, the facts were insufficient to support the trial court's presumption that Taos County jurors were prejudiced against him due to pretrial publicity. To succeed on his claim of factual error, Mr. House must provide clear and convincing evidence that the state court erred in determining that a fair and impartial jury could not be empaneled in Taos County. 28 U.S.C. § 2254(e)(1).

The trial court reached its decision to transfer venue, however, after conducting an extensive evidentiary hearing. *House I*, 978 P.2d at 974. Moreover, after reviewing the record, the New Mexico Supreme Court concluded that substantial evidence supported the trial court's determination that a fair and impartial jury could not be empaneled in Taos County:

> Widespread inflammatory publicity saturated Taos County
> close to the time of the trials; the television, newspaper and

28

radio publicity was highly emotional; the comments by the parties, relatives, and the attorneys in this case further affected public sentiment; the risk of prejudice was increased by the comparatively small population of Taos [County]; jurors in the second trial did not disclose bias during voir dire; and there was a strong likelihood that many potential jurors would enter the third trial with strong predilections toward one party or the other.

*Id*. at 990.[14]  Finally, the federal district court highlighted the evidence concluding that the decision to change venue did not constitute an unreasonable determination of the facts.

In arguing for a contrary outcome, Mr. House relies on *Goss*, *supra*.  His reliance is misplaced.  *Goss* stands for the unremarkable proposition that, in a case in which the defendant challenges the denial of his request for a transfer of venue, pretrial publicity does not ordinarily in and of itself demonstrate entitlement to relief.  439 F.3d at 628-29 (noting that "cases where the courts presume prejudice based upon pretrial publicity alone are rare").  In contrast, the

---

[14]    The New Mexico Supreme Court noted "[f]ederal courts have reserved presumed prejudice only for the most extreme situations." *House I*, 978 P.2d at 984.  The court explained that the New Mexico venue statutes do not require the employment of the same high standard forged in the federal constitutional sphere, but instead require the movant to establish a "reasonable probability" that he or she cannot receive a fair trial in the venue. *Id*. at 985.  Mr. House argues only that the facially neutral New Mexico venue statutes were *applied* in a manner that violates the U.S. Constitution – that is, applied in a manner that involved a constitutionally unreasonable determination of the facts. And that is the question we are authorized to answer.  We do not otherwise presume to consider the substantive merits of New Mexico's venue transfer standards.

29

decision to transfer venue in this case was not based solely on the existence of pretrial publicity. *House I*, 978 P.2d at 988- 990. Instead, the trial court also relied, among other things, on the public-minded attitude of the Taos County population which, in the trial court's experience, increased the likelihood that potential jurors had formed opinions about the case especially given that the case had been tried to two juries in six months, and evidence that several earlier jurors had not sufficiently disclosed biases during voir dire. Mr. House points to polling evidence to support his claim. However, as previously noted, the trial court conducted an evidentiary hearing on the issue and based the decision to transfer venue on findings beyond the existence of pretrial publicity.

Because Mr. House has not met his burden of proving with clear and convincing evidence that the trial court erred in changing venue to Doña Ana County, he is not entitled to relief.

### D. Did the venue transfer constitute fundamental error?

Mr. House next contends that the State's use of the facially neutral venue transfer statute for the unconstitutional purpose of discriminating against him is a fundamental error. Thus, he argues that the state court violated clearly established federal law and unreasonably determined the facts in light of the evidence presented in requiring him to demonstrate that he suffered prejudice by being tried in Doña Ana County. As with Mr. House's prior claims, he cannot

30

obtain habeas relief on this ground.

Mr. House observes that both the New Mexico Supreme Court and the federal district court misapprehended the thrust of his claim. Rather than arguing that he is entitled to a jury trial in Taos County, Mr. House contends that regardless of the venue to which his case was transferred, the Constitution guarantees him freedom from the State's use of facially neutral venue transfer statutes for unconstitutional purposes – to promote racial discrimination and to obtain biased factfinders.

Mr. House's contentions rest on a faulty premise – that the law is clearly established that the alleged Fourteenth Amendment violations at issue constitute fundamental errors. A fundamental error is a "structural defect affecting the framework within which the trial proceeds." *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991). The United States Supreme Court has never held that the alleged Fourteenth Amendment violations Mr. House raises constitute structural (i.e., fundamental) errors. Similarly, no Supreme Court case holds that a transfer of venue over a defendant's objection, even to a venue in which virtually no person of the defendant's race resides, constitutes a structural defect or fundamental error. Indeed, the Supreme Court has held that the Sixth Amendment requires only that a defendant be provided a jury composed of a fair cross section of the venire pool, meaning an impartial jury, "not a *representative* jury." *See*

31

*Holland v. Illinois*, 493 U.S. 474, 480 (1990).

Further, our own review of the evidence confirms the state court did not base its decision on an unreasonable determination of the facts. The record includes evidence that Doña Ana County residents were not particularly biased against Mr. House. For instance, the trial court heard testimony that, of the persons willing to participate, thirty-six percent of those surveyed in Doña Ana County had an opinion, while sixty percent of the Taos County participants had one. The trial court could thus validly determine that more Taos County residents had formed opinions regarding Mr. House's guilt (one way or the other) than potential jurors in Doña Ana County. Approximately 111 of the 300 persons surveyed in Taos County responded that they thought Mr. House was guilty in comparison to sixty-five of 300 residents of Doña Ana County who expressed the same view.

To be sure, the record also shows that Taos County has a greater percentage of Native Americans than does Doña Ana County. *House I*, 978 P.2d at 991 ("The trial court and all the participants . . . were well aware that Taos County has a 6.5% Native American adult population while Doña Ana County has only about 0.8%."). Nonetheless, a disparity in the number of potential Native American jurors is not presumptively discriminatory. Therefore, Mr. House has failed to rebut, by clear and convincing evidence, the presumptive correctness of

the state court's factual findings.

The New Mexico Supreme Court's decision, therefore, was neither contrary to, nor an unreasonable application of, Supreme Court precedent. Nor was it based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, we deny habeas relief on this ground.

**E. Whether the state court's sentencing decisions were contrary to, or an unreasonable application of, clearly established federal law?**

Mr. House also maintains that we should grant habeas relief because the state court's sentencing decisions were contrary to, or involved an unreasonable application of, clearly established federal due process rules.

First, Mr. House contends that New Mexico Court of Appeals's interpretation of New Mexico's vehicular homicide statute, N.M. STAT. ANN. § 66-8-101,[15] was contrary to and involved an unreasonable application of clearly

---

[15] The version of the statute under which Mr. House was sentenced reads:

> A. Homicide by vehicle is the killing of a human being in the unlawful operation of a motor vehicle.
>
> B. Great bodily injury by vehicle is the injuring of a human being, to the extent defined in Section 30-1-12 NMSA 1978, in the unlawful operation of a motor vehicle.
>
> C. Any person who commits homicide by vehicle or great bodily injury by vehicle while under the influence of

(continued...)

established federal law.  Mr. House argues that the New Mexico Court of Appeals

---

[15](...continued)

> intoxicating liquor or while under the influence of any drug or while violating Section 66-8-113 NMSA 1978 is guilty of a third degree felony and shall be sentenced pursuant to the provisions of Section 31-18-15 NMSA 1978, provided that violation of speeding laws as set forth in the Motor Vehicle Code shall not per se be a basis for violation of Section 66-8-113 NMSA 1978.
>
> D.  Any person who commits homicide by vehicle or great bodily injury by vehicle while under the influence of intoxicating liquor or while under the influence of any drug, as provided in Subsection C of this section, who has incurred a prior DWI conviction within ten years of the occurrence for which he is being sentenced under this section, shall have his basic sentence increased by two years for each prior DWI conviction.
>
> E.  For the purposes of this section, "prior DWI conviction" means:
>
> (1) a prior conviction under Section 66-8-102 NMSA 1978; or
>
> (2) a prior conviction in New Mexico or any other jurisdiction, territory or possession of the United States when the criminal act is driving under the influence of alcohol or drugs.
>
> F.  Any person who willfully operates a motor vehicle in violation of Subsection C of Section 30-22-1 NMSA 1978 and directly or indirectly causes the death of or great bodily injury to a human being is guilty of a third degree felony and shall be sentenced pursuant to the provisions of Section 31-18-15 NMSA 1978.

N.M. STAT. ANN. § 66-8-101 (Supp. 1991); *see House II*, 25 P.3d at 260 & n.1 (noting that Mr. House was sentenced under the version of the statute codified in 1991).

committed constitutional error in failing to apply the rule of lenity in assessing the legal propriety of his sentence under the vehicular homicide statute because that statute is ambiguous on the question of whether DWI-related offenses should be deemed more serious than those committed through reckless driving, and does not "contain a preference for one alternative ground for conviction over the other." Aplt. Op. Br. at 53-54. More specifically, he contends that the New Mexico Court of Appeals unreasonably applied clearly established federal due process principles in upholding the trial court's decision to vacate the reckless-driving counts while retaining the DWI-related convictions.

Second, Mr. House attacks the New Mexico Court of Appeals's ruling regarding the use of the recidivist sentencing provision of N.M. STAT. ANN. § 66-8-101(D). According to Mr. House, like the vehicular homicide statute, this provision is ambiguous and therefore the New Mexico Court of Appeals was obliged, under clearly established federal law, to employ the rule of lenity and failed to do so. We reject both arguments.

"[A]mbiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." *United States v. Bass*, 404 U.S. 336, 347 (1971) (internal quotation marks omitted) (quoting *Rewis v. United States*, 401 U.S. 808, 812 (1971)). The rule of lenity applies when a statute is so ambiguous that "reasonable doubt persists about a statute's intended scope even *after* resort to the

35

language and structure, legislative history, and motivating policies of the statute."

*Moskal v. United States*, 498 U.S. 103, 108 (1990) (internal quotation marks

omitted) (quoting *Bifulco v. United States*, 447 U.S. 381, 387 (1980)).

### 1.    Sentencing under the vehicular homicide statute

If applied, the rule of lenity would require us to construe any ambiguity in

the vehicular homicide statute in Mr. House's favor.  However, the New Mexico

Court of Appeals found that New Mexico's vehicular homicide statute was *not*

ambiguous because the enhanced penalties for recidivist DWI-related violations

and the statute's motivating policies made it clear which offense the legislature

considered more serious – the DWI offense.  *House II*, 25 P.3d at 262.  "This is a

determination of state law over which this court has no power to question."

*Chapman v. LeMaster*, 302 F.3d 1189, 1196 (10th Cir. 2002).  A state court's

interpretation of its own law is binding on a federal court conducting habeas

review.  *Id*.; *see Parker v. Scott*, 394 F.3d 1302, 1319 (10th Cir. 2005).

### 2.    Application of the recidivist sentencing provision

Mr. House further claims that because N.M. STAT. ANN. § 66-8-101(D) is

ambiguous, clearly established federal law requires us to apply the rule of lenity.[16]

---

[16]    Before the district court Mr. House also advanced an equal protection
challenge to the recidivist sentencing scheme.  Generally, he argued that the New
Mexico Vehicular Homicide Act's sentencing enhancement provisions violated
the Equal Protection Clause because it is irrational to enhance the sentences of
(continued...)

36

He interprets the statute as allowing the sentencing court to impose a two-year enhancement for each prior DWI conviction on the aggregate DWI-related sentence of a defendant that arises from an accident resulting in death or great bodily injury. Under Mr. House's view, he would have been subject to a single two-year enhancement for his single prior misdemeanor DWI conviction. The trial court, on the other hand, interpreted the statute as permitting the imposition of a two-year enhancement on each of Mr. House's DWI-related counts of conviction that resulted in death or great bodily injury, resulting in a total of five two-year enhancements. Noting that the statute arguably was amenable to these

---

[16](...continued)
those with previous DWI misdemeanor convictions by two years, while enhancing the sentences of those with previous felonies by only one year. *See* R., Vol. I, Doc. 41, at 70-71 (Pet.'s Mem. of Law in Support of Habeas Petition, dated Aug. 4, 2003). The magistrate judge rejected this argument and the district court adopted his findings. Mr. House appears to have abandoned this issue on appeal. We would conclude in any event that it is not properly before us. In his initial statement of appellate issues, Mr. House uses language that might suggest an intention to advance this issue. *See* Aplt. Op. Br. at ii-iii (objecting to application of the recidivist provision and describing "New Mexico's 2 year sentence enhancement for DWI-related vehicular homicide . . . [as] irrational under the Fourteenth Amendment"). However, nowhere in his brief does he develop the equal protection argument relating to the recidivist sentencing scheme; significantly, the summary of argument section contains no reference to it. *See* Aplt. Op. Br. at xxviii (noting in the summary of argument as to "Issue Four" involving a challenge to the recidivist provisions a due process argument involving "the rule of lenity"). Consequently, even if Mr. House harbored some intention to maintain this equal protection claim, we would deem it unsuitable for our review. *See Bronson v. Swensen*, 500 F.3d 1099, 1104 (10th Cir. 2007) ("[W]e routinely have declined to consider arguments that are not raised, or are inadequately presented, in an appellant's opening brief.").

37

conflicting interpretations, Mr. House reasoned that it was ambiguous and the trial court should have applied the rule of lenity.

The New Mexico Court of Appeals rejected this argument, concluding that the statute was not ambiguous and that the statutory language supported the trial court's reading. *House II*, 25 P.3d at 264-65. As with section 66-8-101(A), the New Mexico Court of Appeals's interpretation of section 66-8-101(D) binds us on appeal. *Parker*, 394 F.3d at 1319.

Mr. House cannot demonstrate that the New Mexico Court of Appeals's interpretation of its vehicular homicide statute including the recidivist provision was contrary to, or involved an unreasonable application of, clearly established federal law. Therefore, we deny habeas relief on this ground.

### F. Whether the trial court's refusal to recuse entitles Mr. House to habeas relief?

As his final ground for habeas relief, Mr. House argues that the trial court's refusal to recuse at resentencing violated his Fourteenth Amendment right to due process. We conclude that Mr. House waived this argument by failing to brief the issue before the New Mexico Court of Appeals.

A federal habeas court may not consider issues raised in a habeas petition that have been defaulted in state court on an independent and adequate procedural ground unless the petitioner "can demonstrate cause and prejudice or a

38

fundamental miscarriage of justice." *Thomas v. Gibson*, 218 F.3d 1213, 1221

(10th Cir. 2000) (quoting *English v. Cody*, 146 F.3d 1257, 1259 (10th Cir. 1998)).

Mr. House raised the recusal issue on direct appeal in the New Mexico

Court of Appeals. It held that Mr. House had waived any appellate challenge

regarding his motion to recuse the trial court because, under Rule 12-213 of the

New Mexico Rules of Appellate Procedure, he insufficiently briefed the issue.

*House II*, 25 P.3d at 266-67. Specifically the court noted:

> [Mr. House] captions his argument [regarding recusal] as a
> constitutional challenge to the procedure afforded under New
> Mexico law. However, he makes no substantive argument
> regarding the alleged insufficiency of our procedure, relying
> instead primarily upon recitation of general language
> pertaining to the need for impartial tribunals. He also appears
> to challenge the ruling below as an abuse of discretion.
> Nonetheless, he has not presented to this Court a discussion of
> the facts relevant to our review. He also fails to note that his
> motion has already been reviewed not only by the district
> court, but also by our Supreme Court – neither of which
> discerned any basis for recusal.

*Id*.

"New Mexico courts have consistently applied the rule that deems all issues

abandoned that are not raised in an appellant's brief-in-chief." *Maes v. Thomas*,

46 F.3d 979, 986 (10th Cir. 1995) (holding that Rule 12-213 is independent and

adequate procedural ground). Consequently, the New Mexico Court of Appeals

denied Mr. House's claim on independent and adequate procedural grounds. Mr.

House does not question the independence or adequacy of the procedural rule.

39

Nor does he attempt to demonstrate "cause and prejudice or the prevention of a miscarriage of justice." Therefore, we do not review the merits of Mr. House's claim because of his procedural default in the state appellate court.

## IV. CONCLUSION

For the foregoing reasons, the district court's denial of habeas relief is **AFFIRMED**.

No. 05-2129, *House v. Hatch*

**MURPHY**, Circuit Judge, concurring in part and concurring in the result in part.

The majority opinion is a thorough and scholarly work. It offers a principled and persuasive analysis of how the Supreme Court's recent decision in *Carey v. Musladin*, 127 S. Ct. 649 (2006), affects federal court habeas review of state court decisions under the AEDPA. *See* Majority Op. at 6-16. Under the majority's post-*Musladin* paradigm: (1) the term "clearly established Federal law, as determined by the Supreme Court of the United States" in 28 U.S.C. § 2254(d) is narrowly limited to Supreme Court holdings in cases "where the facts are at least closely-related or similar to" the facts of the petitioner's case[1]; and (2) the absence of such clearly established law brings the inquiry to a close and the petitioner must be denied relief without undertaking an analysis of § 2254(d)'s "unreasonable application" prong.[2] As the majority recognizes, this reading of

---

[1]*Compare* Majority Op. at 8 ("Prior to *Musladin*, the Supreme Court seemed more likely to draw clearly established federal law from general principles teased from precedent."), *with id.* at 10 ("Thus, in the post-*Musladin* analysis, clearly established law consists of Supreme Court holdings in cases where the facts are at least closely-related or similar to the case *sub judice*. Although the legal rule at issue need not have had its genesis in the closely-related or similar factual context, the Supreme Court must have expressly extended the legal rule to that context.").

[2]Majority Op. at 11-12 ("*Musladin* clarified that the threshold determination that there is no clearly established federal law is analytically dispositive in the § 2254(d)(1) analysis. That is, without clearly established

(continued...)

*Musladin* leaves little room for the "extension of legal principle" component of § 2254(d)'s unreasonable application prong, *id.* at 12-16, and operates to overrule one of this court's precedents, *id.* at 13 (concluding *Carter v. Ward*, 347 F.3d 860, 864 (10th Cir. 2003), is no longer good law post-*Musladin*). Applying this new post-*Musladin* paradigm, the majority concludes House's equal protection claims must fail because the Supreme Court has never held that venue transfers are subject to scrutiny under the Equal Protection Clause. Majority Op. at 18-23.

Although the majority's construct is, as noted above, a principled reading of *Musladin*, it seems inappropriate to definitively adopt such a construct in this case. First and foremost, the majority's reworking of the applicable AEDPA standards of review does not come about on the basis of relevant and helpful briefing. Instead, it arises in a briefing vacuum as this case was fully briefed and orally argued several months before the Supreme Court decided *Musladin*. Furthermore, as highlighted by the absence from the majority opinion of citations to relevant case law, it does not appear there is much authority from other circuits addressing these important questions. Although the absence of briefing and helpful authorities might be less disconcerting if the correctness of the majority approach were without doubt, the majority's reading of *Musladin* is not the only

---

[2](...continued)
federal law, a federal habeas court need not assess whether a state court's decision was 'contrary to' or involved an 'unreasonable application' of such law.").

-2-

principled reading.[3]  Most importantly, however, House's equal protection claim

---

[3]For instance, it may well be possible to read *Carey v. Musladin*, 127 S. Ct. 649 (2006), as well as *Wright v. Van Patten*, 128 S. Ct. 743 (2008) (per curiam), as standing for a far more limited and mundane proposition: the established rules at play in those cases (government sponsored courtroom conduct in *Musladin* and the presumption of prejudice flowing from the complete absence of counsel in *Wright*) were sufficiently unlike the facts of the petitioners's cases (the conduct of victim family members in *Musladin* and telephonic appearance by counsel in *Wright*) so that the state courts's refusal to extend the relevant rules to the new situations was not unreasonable.  *See Spisak v. Hudson*, 512 F.3d 852, 854 (6th Cir. 2008) (interpreting *Musladin* in such a fashion). Such a reading is particularly viable given that the Supreme Court does not state in either *Musladin* or *Wright* that it is deviating from its past practices, announcing a new interpretation of § 2254(d), or resolving an important circuit split.  *See* Majority Op. at 12-13 (noting that prior to *Musladin* the Supreme Court precedents were unclear and the circuit courts were divided as to question of whether the absence of a factually similar Supreme Court decision ended the § 2254 analysis). Furthermore, in *Panetti v. Quarterman*, a case decided after *Musladin* but before *Wright*, the majority held as follows: "Nor does AEDPA prohibit a federal court from finding an application of a principle unreasonable when it involves a set of facts different from those of the case in which the principle was announced.  The statute recognizes, to the contrary, that even a general standard may be applied in an unreasonable manner."  127 S. Ct. 2842, 2858-59 (2007) (quotation and citation omitted).  In so holding, the Court specifically cited to *Lockyer v. Andrade*, 538 U.S. 63, 76 (2003), the case the majority asserts was displaced by *Musladin*.  Majority Op. at 8-10.  Thus, *Panetti* seems to indicate that in some cases courts should examine Supreme Court precedent at a higher level of abstraction in analyzing whether the state court applied "clearly established Federal law" in an unreasonable manner.  That higher level of abstraction might well apply in cases where the facts are not as similar as the majority would require.  *Compare* Majority Op. at 21-22 ("Although we acknowledge the long line of Supreme Court cases that stand for the proposition that a state may not purposefully discriminate on the basis of race in jury selection procedures, we nonetheless must heed *Musladin*'s teachings that restrict the scope of clearly established federal law to narrowly-defined Supreme Court holdings.  To demonstrate that the law is clearly established, Mr. House must do more than identify a generalized legal principle." (footnote omitted)), *with Panetti*, 127 S. Ct. at 2858 ("[AEDPA] recognizes . . . that even a general standard may be

(continued...)

fails even under this court's precedent, *Carter*, 347 F.3d at 864, that the majority deems overruled by *Musladin*. Under § 2254(d)'s "unreasonable application" prong as interpreted in *Carter*, it was not unreasonable for the New Mexico state courts to conclude that making venue changes on the basis of racial composition of the trial venue implicates the Equal Protection Clause and to apply a modified *Batson* analysis to House's claim.[4] Nor was the state courts's application of that test to resolve House's claims unreasonable.

In light of this unexceptional avenue for resolving House's equal protections claims, especially when the availability of that avenue is coupled with the lack of briefing on the impact of *Musladin*, it seems unwise to use this case as a vehicle to rewrite the AEDPA standards of review in this circuit. For that reason, I do not join Sections II, III.A, or III.B of the majority opinion, but instead concur in the result as to House's equal protection claims.

I perceive a different flaw in the majority's resolution of House's Sixth Amendment claims. *See* Majority Op. at 23-33. Although House's brief is anything but clear, he appears to be arguing that before a trial court can grant a change of venue on the basis of pretrial publicity, it must hold a hearing and try

_____

[3](...continued)
applied in an unreasonable manner.").

[4]That is not to say, however, that the state courts were compelled to undertake such an analysis. Instead, I simply note that such a course is not unreasonable.

-4-

to empanel an impartial jury. The majority resolves this claim by concluding the state trial court, consistent with Supreme Court precedent, presumed the jury pool in Taos County was prejudiced because of pervasive pretrial publicity. *Id.* at 24-28. The majority then moves on to conclude that the state courts's factual findings regarding the existence of prejudicial pretrial publicity are not erroneous under the standard set out in 28 U.S.C. § 2254(e)(1). The problem with the majority's approach is that it relies on case law that is only tangentially relevant to the actual claim presented.

In essence, House seems to be asserting that prior to granting any prosecution-initiated change in venue based on a claim of bias in the jury pool, a trial court must always attempt to seat a jury. He concludes it appropriate to change venue only if during the process of voir dire it appears the entire venire is tainted. House's claim, then, is premised on some type of positive right flowing from the Sixth Amendment to be tried in Taos County, which right can only be overcome by a failed attempt to seat an impartial jury. One thing is clear: House is not asserting the jury that tried and convicted him was biased by a pervasive atmosphere of pretrial publicity. He is instead asserting the state trial court should not have granted a change of venue because the prosecution did not first prove the jury pool in Taos County was biased.

-5-

None of the cases cited by House and collected in the majority opinion remotely address this issue. Majority Op. at 24-28. Instead, as explicitly noted in footnote twelve of the majority opinion, the cases relied on by House all address situations in which a trial court **refused** to transfer venue in an atmosphere allegedly corrupted by publicity. *Id.* at 25 n.12. Each of those cases addresses the type of showing a defendant must make to prevail on a Sixth Amendment claim based on the denial of an impartial jury. Most importantly for our purposes, however, none of those even suggest that an atmosphere corrupted by publicity is a **prerequisite** to a change in venue. None of the cases prohibit a trial court, in the exercise of its discretion, from prophylactically granting a change of venue based on the mere possibility that adverse pretrial publicity could pose an impediment to a fair trial. On that limited basis alone, I would affirm the district court's denial of habeas relief on House's Sixth Amendment claim.[5]

For those reasons set out above, I join Sections I, III.E, and III.F of the majority opinion and concur in the result in the remainder of the majority opinion,

---

[5]It is far from clear that House has presented his Equal Protection Clause and Sixth Amendment claims in discrete packages. Instead, it is possible to read House's brief as asserting the trial court was required to question the jury pool in Taos County as a prophylactic measure to prevent the prosecution from using potential jury bias as an excuse for making a race-based request for a change of venue. Even so construed, House's claim fails because the state court decision that such a prophylactic measure is not necessary to vindicate House's right to equal protection is neither contrary to nor an unreasonable application of *Batson*.

i.e., denial of relief as to House's claims under the Equal Protection Clause and the Sixth Amendment.